**James ALEX and Betty Jean Alex, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 78–3032.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 10, 1980.

Decided Sept. 22, 1980.

---

Robert J. Boumansour, Los Angeles, Cal., on brief; Lance M. Weagant, Los Angeles, Cal., for petitioners–appellants.

Ernest J. Brown, Dept. of Justice, Washington, D. C., for respondent–appellee.

Before CHOY and TANG, Circuit Judges, and REED,* District Judge.

CHOY, Circuit Judge:

Mr. Alex, a life insurance agent, noticed that by selling a large amount of insurance on behalf of his company he could receive in commissions, office allowances, and bonuses an amount greater than the insureds' first–year premiums. To build his volume, he "sold" insurance in 1972 in violation of California law by reimbursing some insureds' premium payments and by paying other insureds' premiums himself. The Tax Court held that Alex could not deduct or exclude from his gross income the amounts he paid to and on behalf of the insureds. 70 T.C. 322 (1978) (8–7 decision), *overruling Schiffman v. Commissioner,* 47 T.C. 537 (1967). We affirm.

In *Max Sobel Wholesale Liquors v. Commissioner,* 630 F.2d 670 (9th Cir. 1980), we held that under the doctrine of *Pittsburgh Milk Co. v. Commissioner,* 26 T.C. 707 (1956), a seller's payment of cash or extra merchandise to a customer as an added

* The Honorable Edward C. Reed, Jr., United States District Judge for the District of Nevada, sitting by designation.

consideration for a sale is a price adjustment, an exclusion from gross income; that I.R.C. § 162(c)(2) disallows potential deductions which are based on illegal payments, but does not disallow exclusions; and that tax regulations are invalid to the extent they indicate otherwise. Alex concedes that because of § 162(c)(2) he cannot deduct his illegal payments of premiums as business expenses. The question before us is whether, as in *Max Sobel Wholesale Liquors,* the payments may be classified as exclusions beyond the reach of § 162(c)(2). We hold that they may not.

## I. *Reimbursement Method*

### A. *Mechanics*

Alex used two distinct methods to finance the insureds' premiums. Under the "reimbursement" method, the insured would write a check for the amount of the premium payable to Jefferson National Life Insurance Company (Jefferson), Alex's principal, and Alex would write a personal check payable to the insured for the same amount. Jefferson would immediately pay Alex his 90 percent commission and other sums, which he would deposit to make good his own check, which the insured would then deposit to cover his own check. In effect, the insured paid the premium and Alex reimbursed him.

### B. *Commissions as Income*

■ Alex's commissions, allowances, and bonuses were gross income to him. I.R.C. § 61(a)(1). He received them under a claim of right (in return for his selling services, pursuant to his contract) even though he was obligated to, and did, immediately pay them over to the insureds. It is not true that one's paycheck is received without a claim of right and therefore is excludable from gross income, whenever it is "spoken for" by creditors. The situation is the same even if the income which is used to satisfy a debt would not have been obtained absent the transaction that created the debt; for example, Jefferson receives first-year premiums under a claim of right even though that income is immediately paid out to its successful agents.

■ Nor can Alex claim that he received his commissions, allowances, and bonuses without claim of right because he was a mere conduit. Jefferson did not intend its monies to flow through Alex to the insureds (and thence back to itself); it was stipulated that Jefferson was unaware of Alex's scheme.

### C. *Payments as Deductions or Exclusions*

Gross receipts minus exclusions equals "gross income," I.R.C. § 61. Gross income minus allowable deductions equals "taxable income," I.R.C. § 63.

In many cases, expenses related to the obtaining of business income are deductible under I.R.C. § 162(a), and therefore are not reflected in taxable income; for example, Jefferson can deduct its payments to its agents. But Alex can claim no such deductions for his illegal payments, because of § 162(c)(2). Only if the payments can be classified as *exclusions* from Alex's gross income (commissions, allowances, and bonuses) can they serve to lower his taxable income.

■ The payments could constitute exclusions only under the price–adjustment theory of *Pittsburgh Milk.* But the Tax Court below correctly held that that theory applies only in the two–cornered situation where a seller effects a price adjustment by making a payment to its customer. Thus, if Alex had rebated part of his commissions directly back to Jefferson, the rebate would be an exclusion from Alex's gross income; if Jefferson had rebated part of an insured's premium directly back to the insured, the rebate would be an exclusion from Jefferson's gross income.

■ But here the situation is three–cornered, and no price was adjusted by any seller. Jefferson sold insurance, the promise to pay upon a contingency, to the insureds; Jefferson did not adjust this price. The insureds sold to Alex their willingness to participate in his scheme; they made no

payments to Alex to adjust that price. Finally, Alex sold his services to Jefferson; he made no payment to Jefferson to adjust that price. Alex claims that he comes within *Pittsburgh Milk* because he also "sold insurance" to the insureds. In fact, he sold nothing to the insureds; they paid him nothing and received no product or service from him in return.

Therefore, Alex's payments to the insureds were not the acts of a seller adjusting his price, and did not qualify as *Pittsburgh Milk* exclusions. If legal, they might have been deductible as business expenses under § 162(a); because they were illegal, however, § 162(c)(2) barred any deductions.[1]

## II. *Discount Method*

### A. *Mechanics*

Alex used the "discount" method to finance the premiums of insureds who bought a certain kind of policy which had a large first–year cash value. In such cases, Jefferson did not require direct payment; instead, it permitted an insured to write a check to Alex in the amount of the premium (less the cash value). Alex was then to send his personal check to Jefferson for the small amount equal to the premium less Alex's commission (and the cash value). In fact, the insured never gave Alex any check; Alex financed out of his own pocket his check to Jefferson. Alex's allowances and bonuses, which he received later, more than covered this expenditure.[2]

### B. *Commissions as Income*

The discount method had the same substantive economic effect as the reimbursement method, so the Tax Court treated the two the same. However, the fact that un-der the discount method Alex did not actually receive commissions in cash (or pay out in cash the amount of the commissions) warrants some discussion. Alex was a cash–basis taxpayer, and it must be shown that his gross income itself was not "phantom."

■ In *Ostheimer v. United States*, 264 F.2d 789 (3rd Cir.), *cert. denied*, 361 U.S. 818, 80 S.Ct. 61, 4 L.Ed.2d 64 (1959), an insurance agent bought policies on the lives of his co–workers and children. Rather than take his commissions on those policies in cash, he accepted a "discount" on the premiums in that amount from the insurance company. The commissions were held includable in his gross and taxable income, and were not considered an adjustment of the price of the insurance. *Accord, Williams v. Commissioner*, 64 T.C. 1085 (1975) (15–0 vote) (real estate commissions). The only apparent difference between the clearly correct *Ostheimer* case and the present case is that Ostheimer used his credit for commissions to reduce the premium balance owed on policies owned by him, whereas Alex used his credit to reduce the premium balance owed on policies owned by third parties.[3]

Alex's situation can be fairly analogized to that of a manufacturer's representative. When a customer [the insured] orders a widget [insurance] through the representative, it pays him the retail price [the premium]. He transmits the order and the wholesale price [the difference between the premium and the commission] to the manufacturer [Jefferson], retaining the markup [commission] in consideration of his selling services, and the manufacturer sends a widget directly to the customer.

---

1. Section 162(c)(2), after stating its general disallowance rule, explicitly disallows any business deductions for illegal payments to third parties in consideration of the referral of customers. Alex's situation is quite similar.

2. This was also the method used by the taxpayer–agent in *Schiffman*, who sometimes accepted checks from insureds for less than the full amount due, and in some instances indulged in the immaterial variation of accepting full payment from insureds and immediately rebating part of it back.

3. Judge Chabot, dissenting below, argued that *Ostheimer* was distinguishable because Ostheimer's bargain purchases constituted something of value he obtained for his services, whereas Alex obtained nothing of value. This ignores, however, the value to Alex of the opportunity to make bargain purchases on behalf of third parties or to offer bargain purchases to them.

If the representative wants to provide a customer with a free widget, he might certify falsely that the customer has paid him the retail price, and pay from his own pocket the wholesale price to the manufacturer, which then would ship the widget to the customer. Tax law would treat the transaction as if the representative himself had bought the widget, using an *Ostheimer* credit, and then transferred the widget to the customer. The representative would have income in the amount of the markup (but not in the amount of the wholesale price), and would have no tax benefit other than a potential deduction for the value of the widget.

Similarly, Alex's commissions were gross income to him, even though he never received them in cash. The full premium amount (less the cash value)–the value of the policy–might conceivably have been deductible, were it not for § 162(c)(2), but his transactions surely provided him no other tax benefit.

### III. *Other Matters*

Alex argues that the Tax Court had insufficient reasons to overrule *Schiffman*. The decision to overrule was correct, and that is justification enough.

Alex further argues that if his position does not prevail (1) the insureds will be taxable on the amounts they received from Alex and the value of the policies be bought for them, and (2) part–time door–to–door salesmen who, to make sales, offer to customers legal "help with the price" will get no tax benefit from their payments (because they do not itemize and thus cannot use legitimate business–expense deductions). We express no opinion on whether these results indeed flow from our opinion, although we see nothing inequitable about the former. In any event, we have decided this case on its own merits.

There is no evidence in the record to show, and Alex has not asserted, that in 1972 he knew of or relied on the apparent validity of *Schiffman*. Therefore, we need not decide what effect, if any, such knowledge or reliance would have.

### IV. *Conclusion*

Alex's commissions, allowances, and bonuses, but not his cash payments to Jefferson under the discount method, were gross income to him.

Alex's payments to and on behalf of the insureds can be classified only as potential business–expense deductions. The Tax Court correctly distinguished this case's three–cornered situation from the two–cornered situations in *Pittsburgh Milk* and *Max Sobel Wholesale Liquors*, where sellers' payments of cash and merchandise to customers were held to be exclusions from gross income.

Because Alex's payments were illegal, § 162(c)(2) disallows any business–expense deduction based on them.

"Opinions of the Tax Court reflect 'that degree of special expertise which Congress has intended to provide in that tribunal.' *Sibla v. Commissioner*, 611 F.2d 1260, 1262 (9th Cir. 1980). Therefore, we 'should not overrule that body, unless some unmistakable question of law mandates such a decision.' *Id.*" *Max Sobel Wholesale Liquors v. Commissioner*, 630 F.2d at 670.

AFFIRMED.