JOHN W. CUSTIS and ELEANOR H. CUSTIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Custis v. Commissioner
Docket No. 5108-79.
United States Tax Court
T.C. Memo 1982-296; 1982 Tax Ct. Memo LEXIS 454; 43 T.C.M. (CCH) 1511; T.C.M. (RIA) 82296; May 26, 1982. *454 Held, payments by petitioners (life insurance agents) to satisfy premium obligations of purchasers of life insurance policies may not be applied to reduce petitioners' gross commission income. Alex v. Commissioner,70 T.C. 322 (1978), affd. 628 F.2d 1222 (9th Cir. 1980), followed; however, such payments are deductible business expenses not paid in violation of a "generally enforced" state statute within the meaning of section 162(c)(2), I.R.C. 1954. Boucher v. Commissioner,77 T.C. 214 (1981), distinguished. Held further, substantiation of various business travel and entertainment expenses under the strictures of section 274 determinated. Michael J. Occhionero, for the petitioners. John P. Graham, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined deficiencies in petitioners' Federal income taxes of $ 18,335, $ 45,914 and $ 70,305 for the taxable years 1973, 1974 and 1975, respectively. Due to concessions by the parties, the issues remaining for decision are 1) whether payments made by petitioners (life insurance agents) to satisfy premium obligations of purchasers of life insurance policies may be applied to reduce petitioners' *455 gross commission income, 2) whether, if such payments may not be applied to reduce petitioners' gross income, such payments are deductible business expenses not paid in violation of a "generally enforced" state statute, within the meaning of section 162(c)(2), [1] and 3) whether petitioners have substantiated various business travel and entertainment expenses under the stricture of section 274. To facilitate the disposition of the contested issues, we are combining our findings of fact and opinion. Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein by reference. Petitioners John W. Custis and Eleanor H. Custis, husband and wife, resided at Sheffield Lake, Ohio, at the time the petition herein was filed. Deductions for Payments of Customer Premiums
John Custis has been a licensed insurance agent in the State of Ohio since 1946. Shortly after 1946, he created his own agency, the John W. Custis Insurance Service, and operated that business as a sole proprietorship. Eleanor Custis *456 is also an insurance agent licensed by the State of Ohio. During the years at issue, Eleanor Custis worked as an agent in the employ of the John W. Custis Insurance Service. In the early 1970s, the agency entered into a number of agreements with the Ohio State Life Insurance Company. Under these agreements it was possible for the agency to receive commissions and production bonus payments from the insurance company which exceeded the amount of first-year premiums on any life insurance contract sold by the agency. In 1972, petitioners began the practice of seeking out uninsured individuals who either would not or could not afford life insurance. To these individuals, petitioners made the following offer: if the individual would purchase a life insurance policy from the Ohio State Life Insurance Company, petitioners would pay all first-year premiums. Petitioners arranged to pay the first-year premiums by delivering to the insured a currently payable check and 11 post-dated checks -- each check representing the amount of monthly premium due under the policy. These checks were to be deposited in the insured's checking account once a month as they became due. Shortly after each check *457 was deposited, the insurance company, under a so-called "Check-O-Matic" agreement, would automatically withdraw from the insured's account the amount of monthly premium due under the policy. At the time petitioners began this practice of "rebating" premiums, they were unaware of any statutes or cases involving the treatment for tax purposes of payments made by insurance agents to satisfy their customers' premium obligations. Donald McQuilkin has been petitioners' accountant since 1955. While preparing petitioners' 1972 income tax returns, he became aware for the first time of petitioners' premium rebating practice. Unfamiliar with how to account for such premium rebates, he performed a little research. The accountant uncovered a case which seemed directly analogous to petitioners' situation and satisfied himself on the basis of this case that petitioners should treat the payments of customers' premiums as "returns and allowances" against gross receipts or sales on the agency's Schedules C. In 1973 and 1974, petitioners claimed returns and allowances against gross receipts of $ 33,313 and $ 87,403, respectively, attributable to payments of customers' premiums. In 1975, petitioners *458 claimed $ 153,554 as costs of goods sold attributable to payments of customers' premiums. In his statutory notice of deficiency, respondent disallowed each of these items in 1973, 1974 and 1975, respectively. It is generally unlawful in the State of Ohio for an insurance agent to pay or rebate insurance premiums on the life of an insured as an inducement to purchase insurance. [2] *459 A violation of this prohibition against rebates may result in the revocation of an insurance agent's license [3] and, in addition, a fine and a term of imprisonment may be imposed on the agent. [4] At the time of trial, Robert H. Katz ("Katz") had been Assistant Director and Chief Counsel in the Ohio Department of Insurance since October 1975. At some point, the Internal Revenue Service contacted Katz in regard to petitioners' premium rebating activities. In response to an inquiry from the Internal Revenue Service, Katz prepared an affidavit (dated February 11, 1980) in which he stated that upon notice of a violation of * * * [sections 3911.18, 3911.19, 3911.20 and 3911.21] of the Ohio Revised Code, the Department will investigate, and take whatever administrative action as indicated by the evidence. Such action may include revocation of license and referral of evidence to the county prosecutor. In a letter dated March 25, 1980, addressed to John P. Graham, an attorney with the I.R.S., Katz stated, on behalf of the Ohio Department of Insurance: The Department has a continuing interest in the tax case involving *460 John and Eleanor Custis. As you have advised the Department, there is a potential violation of Ohio Insurance Statutes involving rebating of premiums. The Department at this time request [sic] your assistance in that we would need a copy of the complaint filed with the Tax Court on behalf of the Internal Revenue Service. Additionally we would appreciate copies of any other germane pleadings and motions filed by either party. I am aware that the trial [sic] was delayed do [sic] to a health problem of Mr. Custis, however the Department must proceed anyway now that it is on notice of these potential violations. As of the date of trial, on February 4, 1981, the Ohio Department of Insurance had taken no official action against petitioners. Until testimony on the subject was elicited from petitioners at trial, Katz was personally unaware of the identity of the insurance company with which petitioners transacted their rebating scheme. Prior to trial, Katz was asked to search the files of the Ohio Department of Insurance from 1970 to the date of trial for any evidence of enforcement of the provisions of Ohio law prohibiting rebating of premiums by insurance agents. Katz reported at trial *461 that he had found no records indicating enforcement of the provision in that period, either through suspension or revocation of an agent's license or through a consent agreement. Katz was also personally unaware of any criminal prosecutions of an insurance agent under the provision prohibiting the rebating of premiums, though the jurisdiction for bringing criminal complaints resides in the county prosecutor's office and not in the Department of Insurance. Petitioners' first argument is that during the years before the Court they were entitled to subtract premium payments made on customer life insurance policies as "above-the-line" adjustments to their gross commission income on Schedule C -- either as returns and allowances or costs of goods sold. This argument has been rejected in a case factually indistinguishable from the instant case, Alex v. Commissioner,70 T.C. 322 (1978) (a Court reviewed case), affd. 628 F.2d 1222 (9th Cir. 1980), and we see no reason to reexamine that holding here. [5] *462 Petitioners' second argument is that assuming the payments of customer premiums are to be treated as deductions, such payments constituted ordinary and necessary expenditures to obtain commissions and are not barred from being deductible *463 under section 162(c)(2) as illegal payments made in violation of a state statute which is generally enforced. To this argument, respondent replies that petitioners have not shown the expenses to be ordinary and necessary and, in any case, the expenses may not be deducted because they violate a generally enforced Ohio law. In general, section 162(a) allows a taxpayer to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Section 162(c)(2), which qualifies this general rule by disallowing a trade or business expense deduction for certain illegal payments provides, however, in pertinent part as follows: (2) OTHER ILLEGAL PAYMENTS.--No deduction shall be allowed under subsection (a) for any payment * * * made, directly or indirectly, to any person, if the payment constitutes an * * * illegal payment * * * under any law of a State (but only if such State law is generally enforced), which subjects the payor to a criminal penalty or the loss of license or privilege to engage in a trade or business. * * * The burden of proof in respect of the issue, for purposes of this paragraph, as to whether a payment constitutes *464 an * * * illegal payment shall be upon the Secretary or his delegate to the same extent as he bears the burden of proof under section 7454 (concerning the burden of proof when the issue relates to fraud). In defining the term "generally enforced" as it is used in section 162(c)(2), section 1.162-18(b)(3), Income Tax Regs., provides that-- a State law shall be considered to be generally enforced unless it is never enforced or the only persons normally charged with violations thereof in the State * * * enacting the law are infamous or those whose violations are extraordinarily flagrant. For example, a criminal statute of a State shall be considered to be generally enforced unless violations of the statute which are brought to the attention of appropriate enforcement authorities do not result in any enforcement action in the absence of unusual circumstances. We have little trouble in holding that petitioners' payments were ordinary and necessary expenditures of generating insurance commissions from the particular customers to whom petitioners proposed their scheme. These potential customers either would not or could not buy insurance without petitioners making some payment of customer *465 premiums. Cf. Schiffman v. Commissioner,47 T.C. 537, 539 (1967). The more troubling liquiry, it seems to us, is whether such payments were in violation of an Ohio statute which was generally enforced. It is clear that petitioners did violate Ohio law, but on the basis of the evidence presented we are unable to conclude that respondent has shown by clear and convincing evidence that the Ohio statute was generally enforced during the years in question. Boucher v. Commissioner,77 T.C. 214, 218 (1981). To this date the only case expressly considering an argument that a state statute was not generally enforced within the meaning of section 162(c)(2) is Boucher v. Commissioner,supra.Boucher considered the extent of enforcement of a Washington state insurance statute prohibiting the rebating of insurance premiums, a statute quite similar to the Ohio statute at issue here. In Boucher, the respondent called the Deputy Insurance Commissioner of the Washington State Insurance Commissioner's office, who testified that 1) the office had only one investigator who was responsible for conducting all investigations regarding the conduct of insurance agents, 2) the investigator concentrated *466 on cases involving swindles against the consumer and generally became aware of violations of the rebate statute only through complaints of competing agents, 3) the office did not have a "tolerance policy" as to violations of the rebate statute -- i.e., if the office had received a complaint regarding rebating it would have investigated and recommended appropriate sanctions, 4) the Deputy Insurance Commissioner was unaware of any investigations regarding violation of the rebate statute that had occurred between 1969 and the time of trial other than an investigation in 1972 which was terminated because the alleged violator had ceased to be an insurance agent, 5) the Deputy was unaware of any criminal prosecution or license revocation stemming from a violation of the statute, 6) the Deputy believed that there were few cases involving the statute because there were few violations of the statute and 7) the office regularly received and replied to inquiries as to whether certain conduct would be considered a violation of the rebate statute. In Boucher, we termed the question whether the Washington rebate statute was generally enforced a close one, but concluded that on the basis of the *467 record presented respondent had met his burden of proof. The absence of an aggressive policy of detection of violations of the statute, we held, was not fatal to a statute's being considered "generally enforced" when there were other factors explaining the lack of a prosecutorial record under that provision: First, we noted that the enforcement agency regularly issued advisory letters in response to inquiries whether various practices would constitute violations of the rebate statute. Such letters "would go far in serving to prevent violations of the statute" and so, we held, should be considered evidence of statutory enforcement. 77 T.C. at 219. Secondly, we noted that the absence of formal enforcement can be explained either by a lack of general enforcement or by a lack of violations. We were not willing to assume the former explanation when the Deputy Insurance Commissioner was of the opinion that the latter explanation better fit the facts. In the instant case, respondent has presented no evidence of general enforcement. Cf. Boucher v. Commissioner,supra. The facts herein show no formal prosecutions or license revocations arising out of the Ohio statute forbidding rebates *468 from 1970 to the present. State authorities here contend that if violations of the statute are brought to their attention they will in fact enforce the law, but respondent has failed to elicit any testimony regarding the amount of resources, if any, devoted to enforcement of the Ohio rebate statute. He has failed to elicit testimony from which we might infer that a lack of visible enforcement was due to a lack of widespread violation of the statute. He has failed to elicit testimony or other evidence showing that any investigation under the statute, even one that produced no formal action, has been begun since 1970 (or even earlier). Finally, he has failed to produce evidence that the Ohio Department of Insurance has responded to any inquiries from persons attempting to comply with the law or even that any such inquiries were ever made. The only evidence respondent has introduced which supports his position is 1) the testimony and affidavit of Katz that, in the event of notice of a violation, the department will investigate and take appropriate action and 2) a letter from Katz to the respondent expressing interest in copies of documents in the instant case. In regard to the affidavit *469 and letter, we note that those documents were prepared almost a full year before the trial of this case. Up to the time of trial, the Ohio Department of Insurance has taken no formal action against petitioners. [6] Apparently little or no investigation of petitioners' activities has occurred: At trial, Katz admitted that until then he was unaware of the name of the insurance company allegedly involved -- a fact which surely would have been unearthed in even the most rudimentary investigation of petitioners' practices. Such a lack of zeal in pursuing petitioners we think belies Katz' statement that the Ohio Department of Insurance will investigate and take action on any rebate statute violation brought to the department's attention. We are reluctant to conclude that petitioners are entitled to deductions for payments made which clearly violate a state statute. Yet we also must observe the words of the Internal Revenue Code which provide that ordinary and necessary expenses are not to be disallowed unless in violation of a state statute which is "generally enforced." *470 Respondent had the burden of proving that the statute at issue was generally enforced -- not a dead letter. On this record, he has simply failed to meet that burden. Accordingly, petitioners' payments of customer premiums were deductible expenses during the years at issue. Entertainment Expenses
On their 1973 tax return, petitioners deducted $ 8,428 as "sales expense" in connection with their insurance business. On their 1974 tax return, petitioners deducted $ 11,467 as "Meetings-Sales" expenses in connection with their insurance business. On their 1975 tax return, petitioners deducted $ 14,811 as "Sales, promotion" expenses in connection with their insurance business. In his statutory notice of deficiency, respondent disallowed each of the above items in their entirety on the grounds that "the adequate recordkeeping requirements of section 274 of the Internal Revenue Code were not met." Subsequently, respondent has conceded that petitioners are entitled to a $ 115 business entertainment deduction in 1973. Petitioners have provided the Court with a great deal of documentation in an attempt to support their deductions. They provided copies of their American Express charge slips *471 from 1973 through 1975. These slips show total charges of $ 2,678.46 in 1973, $ 1,315.89 in 1974 and $ 3,015.09 in 1975. Not one of these charge slips, however, contains any notation indicating that the expenditure was made for the benefit of anyone other than petitioners or that the charge had anything to do with petitioners' insurance business. Another set of documents put forth by petitioners is a set of cancelled checks and receipts spanning the years at issue. Like the American Express charge slips, virtually all [7] of these checks and receipts are totally devoid of any reference to a business purpose or the individual who may have been entertained by the underlying expenditure. Petitioners have also produced contemporaneously prepared diaries for 1973, 1974 and 1975 kept at their agency's office. In these diaries are notations indicating various luncheon, dinner and weekend expenditures, stating both the individuals entertained and the amounts of the expenditures. The diaries contain no notations indicating the *472 purpose of such expenditures and only occasionally note the location of the lunches and dinners. According to the diaries, petitioners spent $ 15,189.57 in 1973 (120 separate entries), $ 6,593.81 in 1974 (163 separate entries), and $ 6,703.23 in 1975 (121 separate entries) on such meals and weekends. Most of these entries are confirmed in their amounts from the checks and receipts mentioned above. The remaining checks and receipts introduced by petitioners, for which there are no corresponding diary entries, amount to $ 649.32 in 1973 (31 separate items); $ 3,433.09 in 1974 (79 separate items), and $ 3,292.82 in 1975 (71 separate items). Finally, petitioners introduced schedules containing the names of various individuals who, according to petitioners' diaries, were entertained on various weekends at a lodge maintained by petitioners. In these schedules, prepared about the time of petitioners' first audit, petitioners set out 1) each "entertaining" weekend in 1973, 1974 or 1975, 2) the names of the individuals entertained that weekend, 3) insurance policies purchased by the entertained individuals and 4) the date such policies were purchased. Of the 33 weekends in 1973 listed on *473 these schedules, [8] *474 four involved entertainment of home office representatives, 14 involved entertainment of individuals who shortly thereafter purchased a policy through petitioners and 15 involved entertainment of individuals who had just recently purchased insurance through petitioners. Of the 33 weekends in 1974, two involved entertainment of "company officials," 13 involved entertainment of individuals who shortly thereafter purchased a policy through petitioners, 17 involved entertainment of individuals who had just recently purchased a policy through petitioners and one involved entertainment of two individuals, one of whom had just recently purchased and one of whom shortly thereafter purchased insurance through petitioners. Of the 23 weekends in 1975, two involved entertainment of company officials, 15 involved entertainment of individuals who shortly thereafter purchased a policy through petitioners, 5 involved entertainment of individuals who had just recently purchased insurance through petitioners and one was John Custis' 50th birthday celebration to which friends and clients were invited. Section 274(d) provides: (d) SUBSTANTIATION REQUIRED.--No deduction shall be allowed-- (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or (3) for any expense for gifts, unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. The Secretary may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed *475 an amount prescribed pursuant to such regulations. Pursuant to the statutory mandate, the Secretary has promulgated extensive regulations dealing with the issue of substantiation. See section 1.274-5, Income Tax Regs. Applying those regulations to the instant case, we make the following holdings: First, in regard to the American Express charge slips and the checks and receipts bearing no names of individuals entertained, no notations of business purpose of the expenditures and no corresponding diary entries, virtually all these items fail the substantiation requirements set out in section 1.274-5(c)(2)(ii)(b), Income Tax Regs., due to an absence of adequate showing of business purpose. Under section 1.274-5(c)(3), Income Tax Regs., [9] *476 however, taxpayer's have presented sufficient circumstantial evidence that the following items should be allowed: Year
Item
Amount
1974
Plane fare for petitioners to fly
round trip to Baltimore, Md., to
attend an Ohio State Life convention
in April, 1974
[10] *477 $ 360.37
1974
Food and lodging at the Ohio State
Life convention in Baltimore, Md.,
in April, 1974: Bellview Biltmore
171.23
Cheshire Inn
20.00
1975
Plane fare for Eleanor Custis to
fly round trip to Orlando, Fla., to
attend an Ohio State Life convention
at Disneyworld in April, 1975
131.73
These allowed items relate to conventions identified by petitioners' diaries both as to location and date; they were also supported by the testimony of John Custis. In regard to the items not allowed, petitioner's testimony -- either vague, overly-general or non-existent -- was insufficient to establish a specific business purpose for each expenditure. Second, in regard to amounts noted in petitioners' diaries, we hold that only the following items have been substantiated as to 1) amount, 2) time and place of entertainment, 3) business purpose and 4) business relationship of petitioners to persons entertained: Date
Individuals Entertained
Amount
1973
January 13
George & Ralph Straits
$ 63.05
February 17
Daniel Fragassi & Family
44.77
March 10
George Janapolis & Family
72.00
June 17
Josh & Jaci Milner
43.61
July 14
Thomas Jordan
12.09
August 4
Roger Heibel & Family
66.26
August 12
John & Kathy Pinkney *
32.30
September 15
Judd & Chris Bush *
70.00
November 3
George Janapolis & Family
123.93
December 8
Allen Koger & Family
92.74
1974
January 19
Perry Stanbaugh & Wife
17.45
January 26
Donald Carek & Family
68.83
February 9
Carl Pfenninger
63.80
March 16
Judy & Thomas Reott
140.61
May 11
Richard Cieslak and Jimmy Droke
23.20
May 24
Judd Bush & Family *
98.48
June 8
Frances Stanley & Husband
4.50
August 31
Orlando Gutierrez
[11] 65.44
September 28
Orlando Gutierrez
52.51
October 5
William Conrad
7.25
October 12
Gyro's Businessmen & Wives
73.60
October 26
Frank Duguid
60.64
November 16
Lenin Pando
68.71
November 23
James Kolleda
85.80
December 28
William Kretchman
68.99
1975
January 11
Lee Sattler & William Kunberger
73.73
February 16
Judd Bush & Family *
23.25
March 15
Don McQuilkin & Family
60.21
March 29
Mr. & Mrs. James Kolleda
91.73
April 12
Tom & Audrey McClister &
Donald & Nancy Gaslin
84.44
May 10
Margaret Pfenninger & Family
67.58
May 31
Mr. & Mrs. Robert Bound & Family
44.96
June 22
Bob Kleineder & Family &
James Schmidt & Family
96.09
June 28
Charles Combs & Family
4.50
July 12
Donald & Isabel Giangola *
100.50
July 19
Roger & Pat Heibel &
Tom & Fran Stanley
70.09
July 26
Mr. & Mrs. James McCarthy
80.05
August 2
Mr. & Mrs. Richard Cifranic
& Mr. & Mrs. Thomas Jordan
126.94
August 23
William & Kathryn Kretchman
56.04
September 27
Ben & Jane Murphy &
Glen & Shirley Barton
58.98
October 18
Carl Scheu & Family
84.17
November 1
James Irwin & Family
66.30
*478 The above items constitute amounts expended for food, liquor and ice cubes in connection with a lodge petitioners maintained. [12] They were substantiated as to amount both by diary entries and checks or receipts (in the case of each expenditure of $ 25 or more). See section 1.274-5(c)(2), Income Tax Regs.
It was petitioners' practice to bring potential customers, insurance company officials and present friends and clients out to petitioners' lodge for the weekend. Petitioners testified that on a typical weekend, they would relax with their guests and spend a substantial amount of time either discussing their guest's *479 insurance needs (in the case of clients or potential clients) or (in the case of insurance company officials) reviewing new promotional ideas and upcoming agent sales contests. [13] We found this testimony credible as regards company officials and hold that as to the company officials entertained, petitioners' testimony, coupled with the diary entries, receipts and checks, substantiates those claimed deduction. With regard to the other individuals entertained at the lodge, we find petitioners' testimony regarding their selling activities sufficient to meet the test of section 274(d) only in those cases where petitioners showed by their schedules that insurance was purchased by the entertained individuals shortly after the weekend was over. The fact that insurance was purchased after such weekends tends to corroborate circumstantially petitioners' testimony that they made sales pitches to those individuals on each of those lodge weekends. See section 1.274-5(c)(3), Income Tax Regs. With regard to individuals entertained who did not later purchase insurance, we find petitioners' *480 testimony that they discussed business with these people insufficiently corroborated by other circumstantial evidence. [14] See section 1.274-5(c)(3), Income Tax Regs. Accordingly, we have only allowed weekend food entertainment deductions for individuals who petitioners showed to have purchased insurance shortly thereafter. [15] *481 The final category of items claimed by petitioners are expenditures recorded in their diaries (and in most cases corroborated, in amount only, by checks and receipts) which pertain to weekday business entertainment -- i.e. lunches and dinners. Contemporaneous records of business purpose of each of these entertainments are wholly lacking. So too, petitioners have failed to introduce written summaries or testimony or any other sort of evidence to establish the business purpose of these expenditures. Under such circumstances, none of these weekday meal expenses may be deducted. In summary, we hold that petitioners have substantiated travel and entertainment deductions under section 274 of $ 735.75 in 1973, [16] $ 1,451.41 in 1974 and $ 1,321.29 in 1975. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect during the years before the Court.↩
2. Ohio Rev. Code Ann. sec. 3911.20 (Page 1971), effective Aug. 11, 1959, provides in pertinent part as follows: No life insurance company doing business in this state, or any officer, agent, employee, or representative thereof, nor any other person, shall pay, allow, or give, or offer to pay, allow, or give, directly or indirectly, as an inducement to insurance, nor shall any person, partnership or corporation knowingly receive as such inducement to insurance, any rebate of premium payable on the policy or any special favor or advantage in the dividends or other benefits to accrue thereon, or any special advantage in the date of a policy or date of the issue thereof, or any valuable consideration or inducement. See also Ohio Rev. Code Ann. secs. 3911.18 and 3911.19↩ (Page 1971). 3. Ohio Rev. Code Ann. sec. 3911.21↩ (Page 1971). 4. Ohio Rev. Code Ann. sec. 3911.99(B) and (C)↩ (Page 1971).
5. Accord Boucher v. Commissioner,77 T.C. 214 (1981), on appeal (9th Cir., Oct. 26, 1981); Kreisberg v. Commissioner,T.C. Memo. 1979-420. In Alex, this Court overruled its prior holding in Schiffman v. Commissioner,47 T.C. 537 (1967), on which petitioners may have relied in filling out their tax returns during the years at issue. Petitioners argue that they had a constitutional right to rely on the holding in Schiffman and that our Alex decision may not be applied retroactively. In the instant case, respondent's increase in petitioners' gross commission income did not result in the upward adjustment of any other income item or the downward adjustment of any other deduction on petitioners' returns. Therefore a ruling that Alex applies, coupled with a holding that the premium payments at issue are deductible, would produce no net detriment to petitioners. Since we reach this result, petitioners have suffered no harm by the retroactive application of Alex and we need not decide whether petitioners in fact relied on Schiffman or whether Alex may be retroactively applied in other cases. Cf. Alex v. Commissioner,supra,↩ 628 F.2d at 1226.
6. Compare Kreisberg v. Commissioner,supra↩ (petitioner's license to sell insurance revoked under similar California statute).
7. One exception is a check for $ 115, dated 1/12/73, containing the notation "agency dinner." This check formed the basis of respondent's $ 115 concession, noted above.↩
8. It should be noted that three of the weekends listed on this schedule are not associated with any claimed entertainment expenditure. Those three weekends are: March 3-4, March 24-25 and October 27-28.
9. Section 1.274-5(c)(3), Income Tax Regs. provides: (3) Substantiation by other sufficient evidence. If a taxpayer fails to establish to the satisfaction of the district director that he has substantially complied with the "adequate records" requirements of subparagraph (2) of this paragraph with respect to an element of an expenditure, then, except as otherwise provided in this paragraph, the taxpayer must establish such element-- (i) By his own statement, whether written or oral, containing specific information in detail as to such element; and (ii) By other corroborative evidence sufficient to establish such element.
If such element is the description of a gift, or the cost, time, place, or date of an expenditure, the corroborative evidence shall be direct evidence, such as a statement in writing or the oral testimony of persons entertained or other witness setting forth detailed information about such element, or the documentary evidence described in subparagraph (2) of this paragraph. If such element is either the business relationship to the taxpayer of persons entertained or the business purpose of an expenditure, the corroborative evidence may be circumstantial evidence.↩
10. Of this item, both a travel voucher and testimony of John Custis convince us that $ 313.84 was reimbursed by Ohio State Life and included by petitioners in income. The $ 313.84 is therefore deductible by petitioners regardless of whether the demands of section 274(a) are met. Section 274(e)(4)↩.
*. Deductions attributable to the entertaining of company officials. ↩
11. This amount represents half of petitioners' proved expenditures for that day. On this weekend, see text supra,↩ petitioners entertained two individuals, one of whom had recently purchased insurance through petitioners and the other, Orlando Gutierrez, who shortly thereafter purchased insurance through petitioners.
12. None of these amounts related to the maintenance, depreciation, taxes, etc. of the lodge itself. Consequently, the rules of section 274↩ applying to entertainment facilities are not implicated.
13. John Custis was on the board of advisors for the agents' representatives of Ohio State Life Insurance Co.↩
14. In particular, we find it questionable that petitioners attempted to sell insurance at John Custis's 50th birthday party, for which petitioners seek an $ 807.14 deduction in 1975. Such a setting was clearly not conducive to a substantial business discussion. Section 274(e)(1); section 1.274-2(f)(2)(i)(b). See also Paal v. Commissioner,T.C. Memo. 1969-284, affd. 450 F.2d 1108↩ (9th Cir. 1971). 15. We by no means imply that in order to obtain an entertainment deduction under section 274 a taxpayer must show a tangible sale shortly after the entertainment. That is clearly not the law. See section 1.274-2(c)(3)(i), Income Tax Regs.("A taxpayer, however, shall not be required to show that income or other business benefit actually resulted from each and every expenditure for which a deduction is claimed.") In the instant case, however, a tangible sale is the only circumstantial evidence that a business discussion actually took place; testimony and circumstantial evidence is required to establish business purpose under section 1.274-5(c)(3), Income Tax Regs.↩, in the face of inadequate recordkeeping.
16. This figure includes respondent's $ 115 concession.↩