JOE E. FARIS AND MARY A. FARIS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Faris v. Commissioner
Docket Nos. 6635-85; 6835-85; 6837-85; 6838-85
United States Tax Court
T.C. Memo 1988-465; 1988 Tax Ct. Memo LEXIS 497; 56 T.C.M. (CCH) 319; T.C.M. (RIA) 88465; September 26, 1988
Robert M. Willson, for the petitioners. Barbara E. Horan and Randall A. Preheim, for the respondent. GERBER
MEMORANDUM FINDING OF FACT AND OPINION GERBER, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Petitioners
Taxable Year
Deficiency
Joe E. and Mary A. Faris
1977
$  5,630
Docket No. 6635-85
1978
19,936
1979
93,464
J. Ray and Dianne Faris
1978
161
Docket No. 6835-85
1979
1,160
Michael A. and Dana Faris
1978
152
Docket No. 6837-85
1979
1,436
Nicholas H. and Cherie S. Faris
1978
505
Docket No. 6838-85
1979
1,822
The issues [2] for our consideration are: (1) Whether the amounts of $ 5,000 in 1978 and $ 114,000 in 1979 should have been reported by Joe Faris or any petitioners as commission income; and (2) whether certain promissory notes received in connection with a sale of realty had ascertainable fair market values so as to make them includable in petitioners' partnership income in the year of receipt. *499 FINDINGS OF FACT Some of the facts have been stipulated, and the stipulation of facts and the exhibits are incorporated by this reference. Each set of petitioners were husbands and wives during the years in issue and filed joint returns of income. All petitioners resided in Walsenburg, Colorado, at the time of filing their petitions herein. Petitioner Joe Faris (Joe) is the father of petitioners J. Ray (Ray), Michael A. (Michael), and Nicholas H. (Nick) Faris. Joe and his three sons were each partners [3] in Faris Cattle Company (partnership), also known as Joe E. Faris & Sons. Partnership's Federal return of income was filed on the cash basis method of accounting. Petitioners, [4] through partnership, were generally engaged in the business of cattle ranching. Partnership was operated as a family-owned business with the attendant informality between family member-partners. Petitioners were apparently general partners, each with authority to bind the others in partnership matters. As family members and partners, petitioners regularly acted on behalf of each other. *500 Petitioners and partnership were occasionally involved in real estate transactions. Joe held a Colorado real estate license since April 1956. Nick held a Colorado real estate license at varying times since October 1978, and Ray and partnership acquired licenses after the years in issue. Partnership received a real estate sales commission in connection with the purchase of land (not here in issue) from Colorado Fuel and Iron Corporation. Joe's brother-in-law owned Thach Real Estate Agency (Thach) during the years in issue. Prior to November 19, 1975, Joe became aware that the United States Army was looking for land in southeastern Colorado for use as a site to train armored tank operators. At that time, Joe began contacting area ranchers in an attempt to put together a group of ranches (land package) to offer for sale to the Federal Government. The land package was to be about 220,000 acres. One of the ranches (Kitch Ranch) contained about 47,200 acres [5] and had been listed since 1974 with Harold Hancock (Hancock), a real estate broker. Hancock's listing was for an asking price of $ 42.50 per acre and he was to receive a 5-percent commission pursuant to an oral listing agreement. *501 Hancock was also to be the broker with respect to the other parcels which comprised the 220,000 acre land package. Joe was familiar with the Kitch Ranch and had viewed it during 1973 or 1974 while Hancock was showing it to a potential customer. On November 19, 1975, the owners of the Kitch Ranch entered into a written agreement (November agreement) with Faris Land and Cattle Company (Faris Land), a Colorado corporation of which Joe was president. The agreement was negotiated by Joe for Faris Land and Hancock for the Kitch Ranch owners. Pertinent terms of the November agreement included: (1) The owners of Kitch Ranch were "desirous of entering into a transaction involving the sale of approximately 220,000 acres of land * * * [to a] responsible and financially capable buyer." (2) Faris Land was to use its best efforts to locate and negotiate a sale. (3) Kitch Ranch owners would accept $ 55 per acre thereafter. (4) The Kitch Ranch owners and Faris Land would equally divide any amount in excess of the §§ 55 or $ 60 amounts. (5) If Kitch Ranch owners received any offers, other than as contemplated *502 by the November agreement, Faris Land was to have 10 days within which to purchase Kitch Ranch for the appropriate amount per acre, as set forth in the November agreement. (6) Faris Land had the exclusive right to arrange for the sale to the Government and to select a licensed broker to handle the transaction. (7) The November agreement was to be effective for 2 years and if the Kitch Ranch was sold within the period of the November agreement, Faris Land was to receive a 10-percent commission on the gross sales price. On October 5, 1976, the November agreement was extended for 3 additional years until November 19, 1980. Following the November agreement, Joe made presentations to the Department of the Army in Washington, D.C., aerial presentations to Government representatives, and otherwise attempted to interest the Government in the land package. Joe's efforts to interest the Government continued from 1976 through 1983. Hancock received a bona fide offer of $ 42.50 per acre on the Kitch Ranch during the autumn of 1976. Hancock offered Faris Land, through Joe, its right of first refusal, which would have been at a price of either $ 55 or $ 60 per acre during autumn 1976. *503 Faris land did not exercise its right of first refusal. In order to protect the potential for realization of income under the November agreement, Joe devised a plan to seek an option on the Kitch Ranch. By offering the Kitch Ranch owners money and other potential benefits in exchange for the option, the $ 42.50 offer was forestalled. Nick and Don J. McDavid (McDavid), on October 5, 1976, entered into a Joint Venture Agreement to acquire an option to purchase the Kitch Ranch. McDavid was a friend of Nick's and purportedly had sufficient monetary resources to assist petitioners in acquiring the Kitch Ranch. The joint ventures were to contribute $ 100,000 (McDavid - $ 84,000 and Nick -- $ 16,000) and share profits in a 70-percent/30-percent ratio for McDavid and Nick, respectively. The purpose of the joint venture was to obtain the Kitch Ranch and sell it to the Army. The joint venturers' interests were not assignable without consent of the other party. The Option to Purchase Agreement (option agreement), dated October 5, 1976, was between the Kitch Ranch owners as "optionors" and McDavid and Nick, "optionees." The option agreement was negotiated mainly between Joe and Hancock. *504 In exchange for $ 300,000 [6] from Nick and McDavid, the Kitch Ranch owners granted a 3-year option to purchase at $ 45 per acre plus 25 percent of any excess over $ 60 per acre received by McDavid and Nick if sold to the Army under the November 19, 1975, agreement. The option agreement called for 10 percent of the option payments to be paid over to Hancock to be distributed 75 percent to Thach (the procuring broker) and 25 percent to Hancock. [7] In the event of the exercise of the option, Hancock was "authorized to retain for distribution, as commission at closing TEN (10) percent of the purchase price less any option payment made previously." This 10-percent commission was also to be split 75 percent/25 percent between Thach and Hancock, respectively. Of the first $ 100,000 option payment (which was made October 5, 1976), 90 percent went to the Kitch Ranch owners, $ 7,500 to Jeannette F. Thach and $ 2,500 was retained by Hancock. Five thousand dollars of Thach's "commission" found its way back to petitioners. *505 Although at the time of the execution of the option agreement Hancock had the Kitch Ranch listed at $ 42.50 per acre with a 5-percent broker's commission, [8] Joe requested that the option price be set at $ 45.00 per acre and the broker's commission at 10 percent. The $ 2.50 per acre increase was to be paid to the Kitch Ranch owners and channeled back to petitioners. None of the other participants had any objection to Joe's requested increase of the purchase price and commission. The channeling back to petitioners was accomplished by means of the 75-percent/25-percent split between the real estate brokers. [9]
McDavid and Nick made the second option payment, presumably timely and in accord with the option agreement, but thereafter, *506 on or about October 18, 1978, it became apparent that McDavid would not fulfill his obligation with respect to the third and final $ 100,000 option payment. On October 18, 1978, Joe agreed to purchase McDavid's interest in the option agreement for $ 168,000 (already paid by McDavid) plus a percentage of the profit on the eventual sale of the Kitch Ranch. The third and final $ 100,000 option payment was made with a January 9, 1979, cashier's check. The source of the $ 100,000 cashier's check was $ 65,000 from partnership's checking account and $ 35,000 which was part of the proceeds of a loan to Joe. [10]
*507 On May 18, 1979, the option to purchase the Kitch Ranch was exercised in the names of Joe and Nick for $ 45 times 47,200 acres or $ 2,124,000. [11] The $ 300,000 option payments were applied to the purchase price and the balance was from a $ 2,000,000 Federal Land Bank of Wichita (land bank) loan to all petitioners, jointly. Officials of land bank determined that the 47,200 acres had a $ 2,395,000 value as of December 20, 1978. Land bank also required petitioners to supply additional collateral with a value of approximately $ 375,000 for total collateral of about $ 2,770,000, resulting in a 72-percent loan to collateral ratio. Land bank's policy was not to loan more than 85 percent of the value of real property. After disbursement of all costs and expenses [12] petitioners received excess funds of $ 68,707.23, which were deposited into a personal account of Joe and Mary Faris. *508 The $ 300,000 option payments had already been subjected to the agreed 10-percent commission; the $ 1,824,000 purchase price balance produced a $ 182,400 commission. The $ 182,400 was disbursed in accord with the agreements so that Hancock retained 25 percent and 75 percent was given to Thach. In turn, Thach remitted a $ 114,000 check [13] to Joe, which he deposited into his personal bank account. The $ 114,000 was shown on Joe and Mary Faris' general check and deposit ledger as a "commission earned." Joe's daughter and an unrelated person were bookkeepers for Joe and Mary Faris and it is unclear who made the "commission earned" entry. [14] The $ 114,000 amount was not reported, for income tax purposes, by Joe, other petitioners, partnership or Faris Land. Petitioners, collectively, earned and *509 failed to report commission income of $ 10,000 in 1979. Partnership's 1979 income tax return (Form 1965) reported the sale of 11,200 acres of Kitch Ranch to Sunbird Environmental Resources, Inc. (Sunbird), and Cheyenne Land and Mining Company, Inc. (Cheyenne). The basis for the subject land was shown at $ 45 per acre. The same accounting firm prepared Joe's and partnership's income tax returns for the years in question. On April 9, 1979, partnership entered into an Option Contract with the Baldwin Company (Baldwin) to sell 13,480 acres of Kitch Ranch to Baldwin for $ 57.50 per acre or a total sales price of $ 775,100. The terms were $ 50,000 cash at closing and Baldwin's execution of a $ 725,000 wraparound note (payable in designated installments with interest) and deed of trust. On July 6, 1979, Baldwin assigned part (11,200 acres) of its Kitch Ranch Option to Sunbird and Cheyenne. [15] Baldwin was to receive $ 540,000 [16] in exchange for the assignment ( $ 257,000 from Cheyenne and $ 282,000 from Sunbird). Sunbird and Cheyenne executed promissory notes for the full amounts due to Baldwin. The notes provided for payment over 10 years, beginning with interest only until July 15, 1980, and *510 then equal amortized semiannual principal and interest payments. The deeds of trust given in conjunction with the Sunbird and Cheyenne notes were to be inferior to two other deeds of trust held by a bank and partnership. Partnership's deed of trust secured a $ 95,130 note from Sunbird and a $ 74,240 note from Cheyenne. During August 1979, 6,080 acres of Kitch Ranch were sold by partnership to Sunbird for $ 369,360. Sunbird paid $ 34,760 in cash and the balance by means of three notes, as follows: (1) August 6, 1979, 13-percent $ 190,000 note payable to Trinidad National Bank (Trinidad) on August 6, 1980; (2) August 6, 1979, 13-percent $ 48,840 note payable to Trinidad on February 6, 1981; and (3) July 20, 1979, 9.5-percent $ 95,760, 5-year *511 note payable to petitioners with interest only for 1 year and equal amortized semiannual principal payments over the remaining 4 years. During August 1979, 5,120 acres of Kitch Ranch were sold by partnership to Cheyenne for $ 304,640. Cheyenne paid $ 34,240 in cash and the balance by means of three notes identical to those described above for Sunbird, except for the amounts, which were $ 140,00, $ 56,160 and $ 74,240, respectively. Sunbird's and Cheyenne's notes to petitioners were secured by deeds of trust to petitioners. The notes to Trinidad were secured by deeds of trust to Trinidad. At the closing of these sales, the Federal Land Bank was paid $ 504,000 ( $ 45 per acre) for the 11,200 acres of Kitch Ranch sold to Sunbird and Cheyenne. Sunbird and Cheyenne were not permitted to assume petitioners' mortgage with the Federal Land Bank and said mortgage lien, on the 11,200 acres, was released after payment of the $ 504,000. No cash was received by partnership from either sale because all cash was used to pay the Federal Land Bank debt. Mortgage title insurance was not obtained with regard to either of the deeds of trust from Sunbird or Cheyenne. Petitioners thought that *512 local banks would not loan money on the Cheyenne and Sunbird notes and petitioners did not attempt to sell them. Petitioners recognized that their chances of being paid on the two notes was dependent upon Sunbird's and Cheyenne's success in the land sales venture. In the year of sale petitioners received only $ 1,000 and $ 9,600 on the Sunbird and Cheyenne notes, respectively. In the beginning of 1980, $ 2,870.49 was received on the Cheyenne note. Aside from these payments little, if anything, was received from Sunbird and Cheyenne on these notes. Petitioners did not foreclose after this payment default because they did not want to reacquire the property subject to the debt. Eventually, when the land became part of the condemnation by the Federal Government on behalf of the Department of the Army, petitioners, on September 30, 1983, were paid $ 89,957.41 and $ 65,725.61, without interest, by the Government on the Cheyenne and Sunbird notes, respectively. It was well known during 1979 that the Department of the Army was interested in land in and around the area of the Kitch Ranch. The failure of Cheyenne and Sunbird's land sales venture was precipitated by a 1980 announcement, *513 by the Department of the Army, that the Kitch Ranch was likely to be condemned. Petitioners and partnership did not report income from the receipt of the Sunbird and Cheyenne notes on the ground that the notes had no ascertainable value. Petitioners' proffered expert concluded that the notes had no ascertainable value. Respondent, originally included the notes in petitioners' income at their face values of $ 95,760 and $ 74,240 Respondent's proffered expert utilized a 20-percent discount rate to arrive at present values of $ 73,500 and $ 57,000 for the notes in question. Sunbird and Cheyenne were subdividing the property into recreational or residential-type lots which were being sold for amounts ranging from $ 128 to $ 205 per acre. During 1979 about 11 sales were made of lots ranging from 400 to 640 acres. As of the time of receipt, during 1979, the Cheyenne and Sunbird notes had ascertainable fair market values of $ 57,456 and $ 44,544, respectively. OPINION The two issues in these consolidated cases concern whether some or all of petitioners realized and should have recognized income from transactions concerning the Kitch Ranch. In one instance petitioners (as purchasers) *514 increased the option or purchase price of the entire ranch by $ 2.50 per acre. Respondent contends the increase is commission income to one of petitioners. Petitioners contend that the increase in price was merely to develop working capital through increased borrowings from the bank and not income to them because, as purchaser-borrowers, they were required to repay the increased borrowings. Moreover, petitioners contend that if it was income, it would be reportable by them as partners in proportionate shares. The other issue involves a resale of part of the Kitch Ranch wherein petitioners received notes in part payment of the purchase price. Petitioners contend that the notes had no ascertainable fair market value and, accordingly, that they should not be included as income in the year of receipt. Respondent, on the other hand, argues that the notes were secured or supported by a viable business enterprise and that there was likelihood of payment, resulting in an ascertainable fair market value at the time of sale. Initially, we note that respondent has argued that Joe (petitioner-father) should be required to report the entire commission in dispute because he was the only one *515 qualified as a real estate broker and because he used some of the proceeds in question in his personal account or in repayment of both personal and partnership obligations. Our findings in this case dictate that the transactions involving the Kitch Ranch were attributable to all petitioners, in their percentage share as partners or shareholders, as appropriate. Each petitioner, in connection with ranching and real estate deals, acted on behalf of the other. Even though initially only petitioner entered into the option agreement, the obvious purpose of the option agreement, from petitioners' point of view, was to save their joint interest in potential profit from condemnation by the Government. In this setting, we are not persuaded by respondent's argument that some of the proceeds were transferred to or though personal accounts or finally expanded for personal purposes. Nor can we single out Joe as the sole recipient of any income from the Kitch Ranch transactions, where the documentation generally [17] reflects that all petitioners have a share in the profits or losses. *516 The $ 2.50 Price Increase
Respondent argues that this issue is governed by a line of cases that, in effect, hold that a taxpayer must report commission income in circumstances where the sale of the service or product is to himself. See Alex v. Commissioner,628 F.2d 1222, 1224 (9th Cir. 1980); Ostheimer v. United States,264 F.2d 789 (3d Cir. 1959), cert. denied 361 U.S. 818 (1959); Commissioner v. Daehler,281 F.2d 823, 824 (5th Cir. 1960); Williams v. Commissioner,64 T.C. 1085, 1088 (1975). [18] Respondent's second line of attack, relying upon the parol evidence rule, is that the agreement contains the denomination "commission" and petitioner(s) are not entitled to vary or contradict the agreement. Petitioners argue that their situation is distinguishable from the above-cited line of cases because the increase of their own purchase price merely generated a proportionately larger obligation of repayment to the bank. Petitioners refer us to Commissioner v. Glenshaw Glass Co.,348 U.S. 426 (1955), and Matarese v. Commissioner,T.C. Memo. 1975-184. *517 This controversy prompts us to consider again the simple, but infinite, concept of gross income, as defined in section 61 and pervasively interpreted in case law. See Commissioner v. Glenshaw Glass Co., supra at 430. In our search for the appropriate definition of income we have, at various times, been asked by both respondent and taxpayers to exalt substance over form, Diedrich v. Commissioner,457 U.S. 191 (1982); Crane v. Commissioner,331 U.S. 1 (1947); Ray v. United States,762 F.2d 1361 (9th Cir. 1985), or to consider the form to be controlling. Old Colony Trust Co. v. Commissioner,279 U.S. 716 (1929). Petitioners have convinced us, in these unique circumstances, that part of the amount received from this transaction was not income but represented borrowed capital, which they had an obligation to repay. The factual circumstances of this case are somewhat unusual because of the lack of transactional documentation and informal relationship of petitioners. Petitioners are primarily ranchers situated in rural Colorado. Brokerage agreements for ranches exceeding 200,000 acres are orally *518 entered into and effectuated. Moreover, petitioner-husbands are father and sons who jointly operated a ranching business and also were regularly involved in other business-type transactions, including dealing in real estate. Their business activities were generally carried on through a loosely defined and operated [19] partnership or a corporation they had formed. Although the father clearly was the family patriarch and held largest percentage ownership interest in all activities, each petitioner had authority to and did act on behalf of the others. The essential operative facts we have found are: (1) Petitioners, during 1975, became aware that the Government was interested *519 in ranch land in their area for purposes of condemnation. (2) Petitioners were involved in ranching and some of them were qualified to engage in real estate transactions. (3) In an attempt to profit from the Government's condemnation, petitioners' corporation entered into an agreement with ranch owners (Kitch Ranch) to locate a buyer [20] and sell the ranch. The agreement had the following significant terms: (a) Although the ranch was already listed for sale by another agent-broker for $ 42.50 per acre, the ranch owners agreed to accept $ 55 or $ 60 (depending upon the timing) per acre and divide, equally with petitioner's corporation, the excess (over $ 55 or $ 60) received from a buyer; (b) petitioner's corporation had a 10-day option to purchase (at $ 55 or $ 60), if the ranch owners received a bid on their outstanding offer to sell for $ 42.50 per acre; (c) petitioners' corporation was to receive 10 percent of the gross sales price as a commission. (4) Shortly, thereafter, the ranch owner's received a bona fide $ 42.50 purchase offer. (5) Petitioners did not exercise their right of first refusal, but convinced the ranch owners to enter into an option agreement and the $ 42.50 *520 bona fide offer was rejected. (6) The significant terms of the option agreement were: (a) One petitioner and a friend, with venture capital, were designated as optionees who were to pay $ 300,000 in three equal installments; (b) Petitioner optionee was to contribute 30 percent and his friend 70 percent; (c) the option price was $ 45 per acre plus 25 percent of any sales price over $ 60 to any third party; (d) a 10-percent commission was to be paid to original agent-broker to be divided 25 percent for agent-broker and 75 percent to a broker related to petitioners; (e) the 75-percent amount was to be divided so that petitioners received two-thirds (or one-half of the 10-percent total). (7) The ranch owners would have granted the option for $ 42.50 per acre and a 5-percent commission, but agreed to $ 45 per acre and a 10-percent commission as requested by petitioners. (8) The 70-percent optionee failed to meet his obligations and petitioners bought his option interest. After petitioners became the sole optionee, they (in the names of two of petitioners) purchased the ranch under the terms of the option agreement. (9) Petitioners received $ 5,000 in one year and $ 114,000 in another *521 due to their purchase of the ranch under the option agreement. (10) Petitioners financed their purchase with borrowed capital. Do these facts reflect that petitioners, by increasing the purchase price, loan obligation and "commissions" by $ 2.50 per acre, fall within the broad definition of income? The Supreme Court fashioned a basic pattern with which to evaluate whether items are "gross income" for purposes of taxation. Gross income includes "instances [or items] of undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." Commissioner v. Glenshaw Glass Co., supra at 431. The $ 2.50 per acre was "clearly realized." Further, petitioners exercised "complete dominion" and control over the loan proceeds. The decisive element here in controversy is whether the $ 2.50 per acre represents an "undeniable accession[s] to wealth." We agree with petitioner that the $ 2.50-per-acre increase in purchase price and corresponding increase in purported commissions are not accessions *522 to wealth. Analysis of the line of cases relied upon by respondent reveals distinguishing differences from the facts and circumstances of this case. The seminal holding can be found in Ostheimer v. United States,264 F.2d 789 (3d Cir. 1959), cert. denied 361 U.S. 818 (1959)(Ostheimer).That case presents a clear factual pattern where an insurance agent purchased policies on the lives of his children and coworkers Rather than receive a commission upon the issuance of these policies, Ostheimer accepted a "discount" on the premium due. Ostheimer was found to fit within the Glenshaw Glass pattern. Clearly, he realized an "accession[s] to wealth" over which he exercised dominion and control. To the same effect with respect to real estate commissions, see Williams v. Commissioner,64 T.C. 1085 (1975)(Williams), and Commissioner v. Daehler,281 F.2d 823, 824 (5th Cir. 1960). [21] Williams worked as a real estate salesman and received a commission for each sale he arranged between his employer and a purchaser. In Williams we held that the taxpayer was not entitled to exclude the commission from income. *523 The rationale relied upon in both cases was that the taxpayers received the commissions for their services. Ostheimer v. United States, supra at 792; Williams v. Commissioner, supra at 1088-1089. Accordingly, the reduction or "discount" was attributable to the taxpayer's labors and was, in essence, being used as part payment of the premium or purchase price. Alex v. Commissioner,628 F.2d 1222 (9th Cir. 1980), affg. 70 T.C. 322 (1978)(Alex), presents what may be termed a second generation of the Ostheimer line of cases. Alex involved an insurance salesman or agent who found that by selling a large volume of insurance the insurance company would pay him commissions, office allowances and bonuses, all of which exceeded the first-year premiums on the policies sold. With this premise, Alex increased his volume by paying the insureds' *524 premiums himself, although it was illegal under state law to offer, as an inducement to purchase insurance, any rebate of premium. Alex included the commissions, allowances and bonuses in income and reduced that amount by the amount of insureds' premiums paid. Alex called the reduction amount "Discounted Premiums" and claimed them as cost of goods sold. A majority opinion of this Court overruled [22]Schiffman v. Commissioner,47 T.C. 537 (1967), which had treated discounts or rebates as price adjustments and excludable from income. In so holding, the reduction as "cost of goods sold" was denied. The majority opinion also held that, as conceded by Alex, the payment of the insureds' premiums was not deductible from gross income because of illegality. See section 162(c). The Court of Appeals for the Ninth Circuit affirmed Alex, under similar grounds as the majority of this Court, except *525 that the Circuit Court considered Ostheimer as supporting precedent for their holding and affirmance, as follows: The only apparent difference between the clearly correct Ostheimer case and the present case is that Ostheimer used his credit for commissions to reduce the premium balance owed on policies owned by him, whereas Alex used his credit to reduce the premium balance owed on policies owned by * * * third parties. [Alex v. Commissioner,628 F.2d 1222, 1225 (9th Cir. 1980).]
Although the holdings in Alex are somewhat clouded, they, in essence, stand for the proposition that amounts received by or reduced from obligations of taxpayers are includable in income if attributable to their services. The factual pattern herein does not fit within the line of cases discussed above. Unlike Ostheimer, Williams and Alex where the remunerative commissions for services were clearly accretions to wealth, here petitioners were not receiving commissions from the seller of realty for services in locating a buyer. Petitioners could have purchased the Kitch *526 Ranch for $ 42.50 per acre and a 5-percent commission would have been paid to real estate agents. Under those terms, none of the 5-percent commission would have been channeled to petitioners. Instead, petitioners convinced the seller to accept $ 2.50 more of $ 45 per acre with an apparent 10-percent commission, half of which ( $ 2.25 per acre -- $ 45 x .05), [23] was to be channeled back to petitioners. Accordingly, petitioners were not receiving a commission from the third-party-seller, but were instead increasing the price they had to pay in order to generate additional or excess capital from the borrowing on the transaction. Petitioners, however, were entitled to a $ 5,000 commission on each of the option payments. Those $ 5,000 amounts received from the seller under the option agreement represent commissions paid by the seller or accretions of income to petitioners. Accordingly, we find that petitioners failed to report their proportionate partnership share of $ 10,000 of commissions for 1979. *527 With respect to the remaining $ 104,000 (originally $ 114,000 less $ 10,000 determined to be commission income above) for 1979, we hold that it was not an accretion to petitioner's income and that it represented excess proceeds of a loan not used for real property acquisition. Whether advances to a taxpayer are loans is not necessarily governed by the form of the transaction and the substance of the transaction may dictate its true character. Gregory v. Helvering,293 U.S. 465 (1935); United States v. Henderson,375 F.2d 36 (5th Cir. 1967); Matarese v. Commissioner,T.C. Memo. 1975-184. Petitioners here were entitled to purchase the Kitch Ranch for $ 42.50 per acre and we find that, in substance, they did pay only $ 42.50 per acre. The additional amounts, except to the extent found to be part of the $ 5,000 and $ 10,000 commissions determined above, represent proceeds of a loan which petitioners remained obligated to repay. It is an established principle that amounts received int he nature of loans are not income. Gatlin v. Commissioner,34 B.T.A. 50 (1936); *528 Matarese v. Commissioner, supra. Where an amount of money received must be repaid, the transaction is in the nature of a capital transaction. That is not to say that the repayment requirement alone will render a transaction to be in the nature of a loan, rather than an accretion of wealth or income. [24] Although petitioners in this case cast the form of the transaction in question as a corresponding increase in purchase price and commission to themselves, the substance of the transaction reflects that it was merely an increase in petitioners' borrowings and in no way enriched petitioners without the concomitant obligation of repayment. Parol Evidence Rule
Respondent argues, as a second ground in support of his position that petitioner(s) received commission income, that the parol evidence rule would limit petitioners from arguing that the *529 form of the option agreement should be ignored. More specifically, the amounts in dispute were labelled as commission income in the option agreement and respondent argues that petitioners are prohibited under the parol evidence rule from arguing otherwise. The seminal question we must answer is whether petitioners should be allowed to ignore the transactional form where the amount involved was labelled "commission." We have observed that "the taxpayer may have less freedom than the Commissioner to ignore the transactional form that he has adopted." Bolger v. Commissioner,59 T.C. 760, 767 n.4 (1973); Coleman v. Commissioner,87 T.C. 178, 202 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987). We have required that "strong proof must be adduced" in order for a party to overcome a declaration in the form of an agreement. Ullman v. Commissioner,264 F.2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957); Coleman v. Commissioner, supra at 202. A party has adduced "strong proof" *530 when he has essentially shown that the terms of the written agreement do not have "some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." Schulz v. Commissioner,294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960). See also Lazisky v. Commissioner,72 T.C. 495, 501 (1979), affd. sub nom. Magnolia Surf, Inc. v. Commissioner,636 F.2d 11 (1st Cir. 1980). Respondent argues that we should apply the more restricted view of the Court of Appeals for the Third Circuit in Commissioner v. Danielson,378 F.2d 771 (3d Cir. 1967), vacating 44 T.C. 549 (1965), which was extended in Sullivan v. United States,618 F.2d 1001, 1007 (3d Cir. 1980). The Third Circuit rejected our "strong proof" standard and would permit the parties to stray from the terms of a written agreement only if they could produce proof "which in an action between the parties to the agreement 'would be admissible to alter that construction or to show its unenforceability *531 because of mistake, undue influence, fraud, duress, etc.'" Coleman v. Commissioner, supra at 202 n.17. We have not follow the so-called "Danielson Rule" in circuits other than the Third Circuit and decline to do so in the Tenth Circuit (which has not spoken on this point) to which a appeal would lie in this case. We hold that petitioners have met the "strong proof" standard by showing that the property could have been purchased for $ 42.50 per acre with a 5-percent commission due from the seller. Petitioners as purchasers requested that the purchase price by increased and that the seller pay an increased commission essentially equivalent to the increase in purchase price. Most of the increased purchase price was turned over to petitioners. Petitioners as "reasonable men, genuinely concerned with their economic future, [would not have] bargain[ed] for such an agreement." Petitioners sole proven purpose for the increase in the price they were willing to pay was to generate excess borrowing to provide them with capital. Surely petitioners did not enter into the expressed terms of the option agreement in order to pay income tax on excess loan proceeds. *532 Admittedly, there may have been more sophisticated and perhaps more efficient means to accomplish their goal, but we attribute petitioners' modus operandi to the informal rural environment and lack of legal assistance in these matters. We cannot and do not find that petitioners generated taxable income from borrowings that they were required to repay. Cheyenne and Sunbird Notes
The question here is the value, if any, of two notes received by petitioners as part of a sale of a portion of the Kitch Ranch during 1979. Petitioners, in addition to other amounts, received notes from Sunbird and Cheyenne in the face amounts of $ 95,760 and $ 74,240, respectively. Respondent, in his determination that petitioners had gain from the sale of this land, included the face amount of the notes in computing partnership income. For purposes of this case petitioners argue that no part of the notes was includable in 1979 because they did not have an ascertainable value. Respondent now contends, based upon his expert's valuation, that the fair market values of the Sunbird and Cheyenne notes are $ 73,500 and $ 57,000, respectively. [25]
*533 We must consider whether these notes had an ascertainable fair market value and, if so, the amount of that value. If the notes have no ascertainable value, then petitioner need not have reported any income from said notes in the year of receipt and the transaction is left open so that reportable income will occur when and if the note or any part of it is paid. If the notes have an ascertainable fair market value, that amount is includable in partnership income. Sec. 1001(b). In determining the amount realized and accordingly recognized (see Section 1001(c)) we must determine the amount that a willing buyer would pay a willing seller, when neither party is acting under compulsion, and both are informed of all relevant facts. Bankers Trust Co. v. United States,207 Ct. Cl. 422, 518 F.2d 1210, 1219 (1975), cert. denied 424 U.S. 966 (1976); McShain v. Commissioner,71 T.C. 998, 1004 (1979). The existence of an ascertainable fair market value is to be determined from all of the facts and circumstances in each case. Riss v. Commissioner,368 F.2d 965 (10th Cir. 1966), *534 affg. a Memorandum Opinion of this Court; McShain v. Commissioner, supra at 1004. It is, however, only in rare and extraordinary circumstances that property (including notes) will be considered not to have an ascertainable fair market value. Sec. 1.1001-1(a), Income Tax Regs. We do not think the instant case presents the unusual type circumstance where a fair market value is not ascertainable. Here, petitioners were paid approximately $ 60 per acre with a relatively small down payment and notes in payment of the balance. The value of the notes was dependent upon the business success of Sunbird and Cheyenne. At the time petitioners' partnership received the notes in the face values of $ 95,760 and $ 74,240, respectively (total amount of $ 170,000) from Cheyenne and Sunbird, the ultimate business prospects for the land subdivision venture were not in question. About 11 lots were sold during the 1979 calendar year and some payments had been made in accord with the terms of the notes. Although the potential of condemnation may have been considered to have an adverse affect upon the potential for success of the subdivision activities, *535 it would, in the long run, possibly provide assurance that the notes would be paid off by the proceeds of condemnation. It was apparent in 1979 that the Department of the Army was interested in the subject realty. Respondent's expert, after considering the stated rate of return and some of the possible detrimental effects upon value, used a 20-percent discount rate to arrive at values of $ 73,500 and $ 57,000 or a total of $ 131,000. We feel that respondent's expert did not give sufficient weight to these detrimental effects and we have found that the 1979 fair market values of the Cheyenne and Sunbird notes were $ 57,456 and $ 44,544, respectively or a total of $ 102,000. To reflect the foregoing and to appropriately consider the agreements of the parties, Decisions in docket No. 6635-85, 6835-85, 6837-85 and 6838-85 will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: J. Ray Faris and Dianne Faris, docket No. 6835-85; Michael A. Faris and Dana Faris, docket No. 6837-85; Nicholas H. Faris and Cherie S. Faris, docket No. 6838-85. ↩
2. The parties, by stipulation, resolved numerous issues raised in the notice of deficiency. On brief, petitioners noted some minor discrepancies between the stipulation and respondent's brief. In the event of any discrepancy, the parties' stipulation shall be controlling. With respect to the first issue (commissions), petitioners' brief included a $ 5,000 commission for 1978, in addition to the $ 114,000 in dispute for 1979. Respondent did not mention the $ 5,000 amount in the statement of issues or argument portion of his opening or reply brief, but did include it in the findings of his opening brief. Petitioners labeled this circumstance as a briefing omission or concession by respondent. Because petitioners bear the burden of proof on this issue and due to respondent's requested finding, we do not accept petitioners' position that respondent's briefing omission is a concession. See Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.↩
3. ↩
Name
Percent Interest
Joe
50
Ray
17
Nicholas
17
Michael
16
Total
100
4. The use of the term "petitioners" denotes husband-petitioners because it appears from the record that the wife-petitioners were not involved in the subject transactions or partnership. ↩
5. The Kitch Ranch was 16 miles at its longest dimension and 7 miles at its widest. ↩
6. The $ 300,000 was payable in three $ 100,000 installments due Oct. 5, 1976, Dec. 26, 1976, and Jan. 10, 1979. ↩
7. A 75-percent/25-percent split was unusual as between real estate agents and brokers and a 50-percent/50-percent split was more usual. ↩
8. Five percent was the usual and customary real estate broker's commission in southeast rural Colorado, although brokers were free to negotiate for larger or smaller amounts. ↩
9. The normal division of commissions between cooperating brokers was 50 percent/50 percent and Thach was to pay two-thirds of its 75-percent commission to petitioners, leaving Thach with the so-called normal 50-percent/50-percent division of a 5-percent total commission. ↩
10. It is difficult to draw any discrete findings or place any significance upon the source of the funds used to pay the $ 100,000 due to the informality and lack of succinct segregation of funds employed by petitioners. Joe, partnership and Faris Land had at least eight outstanding notes payable to the First National Bank of Walsenburg. There is no clear pattern of segregation regarding disbursement of loan proceeds or repayment. Further, the loans were apparently treated, by the bank, as a "fungible" group for purposes of renewal, etc. The only meaningful conclusion we can draw from these circumstances is that the bank appears to be relying on the assets of petitioners individually and all their related business entities and assets for purposes of extending credit on various endeavors, both personal and business. ↩
11. About 1 year prior to this purchase Baldwin purchased a similarly located and sized ranch for $ 42 per acre. ↩
12. Land bank was to hold $ 100,000 to purchase 20,000 shares of bank stock, which amount was to be either refunded to the borrower or, at some point, applied against the loan obligation. ↩
13. This amount represents the balance of the so-called "commission" not retained by Hancock or Thach. The amount does not exactly equal the percentage amounts contained in the agreement and the parties do not address this discrepancy and, accordingly, we accept this figure as correct for purposes of this case. ↩
14. Joe did not recognize the handwriting on the questioned entry. ↩
15. Joe's signature, without any specific designation, appears on the assignment for purposes of ratification. ↩
16. The $ 257,000 and $ 282,000 amounts fall $ 1,000 short of the $ 540,000 stated consideration. These incorrect amounts were reflected in the agreement of the parties, to wit: "ADDENDUM TO AGREEMENT OF JULY 6, 1979 BETWEEN THE BALDWIN COMPANY, Sunbird ENVIRONMENTAL RESOURCES, INC., AND CHEYENNE MINING AND LAND CO., INC." ↩
17. The original agreement was between the Kitch Ranch owners and all petitioners, through a common business entity. Although the option agreement was initially executed by one petitioner and his friend, the unrelated optionee's interest was brought out before exercise of the option. The Kitch Ranch was purchased, under the option agreement, by all petitioners. ↩
18. Respondent also referenced United States v. Allen,551 F.2d 208, 212↩ (8th Cir. 1977), but that case does not have direct relevance to the situation here. 19. Petitioners did not have established bookkeeping and business practices concerning deposit of receipts. Further, they did not always place all names on documents concerning partnership property. In one instance Joe deposited part of the proceeds from the sale of reality into his own personal bank account. Various loans for multiple purposes (possibly some were personal in nature) were lumped together by the bank and treated as one, irrespective of whether they bore partnership or individual names. ↩
20. The intended buyer was the United States Army. ↩
21. Although we were reversed in Commissioner v. Daehler,281 F.2d 823 (5th Cir. 1960), we subsequently decided that we would follow the view of the Court of Appeals in that case. See Williams v. Commissioner,64 T.C. 1085↩ (1975). 22. Seven of this Court's then sixteen judges dissented and did not wish to overrule Schiffman v. Commissioner,47 T.C. 537↩ (1967). Six of the sixteen judges joined in a concurring opinion drawing other distinctions with regard to another line of cases. 23. The terms of the option agreement do not provide for equivalency between the increased purchase price and increased commission. The increase of the purchase price is $ 2.50 x 47,500 or $ 118,750, whereas the increase to the commission is $ 2.25 x 47,500 or $ 106,875. Although there is a $ 11,875 difference between these amounts, the facts in this case do not comport with the above analysis. Initially, the parties' controversy focused upon whether Joe should report a $ 5,000 commission in 1978 and a $ 114,000 commission in 1979. On brief, respondent made a persuasive factual presentation reflecting that Joe or petitioners received commissions on the $ 100,000 option payments prior to the purchase. Further, the above-described discrepancy in amounts, along with mathematical progressional changes accompanying a doubling of the "commission" percentage while increasing the purchase price only 6 percent, produced benefits to petitioners in excess of the $ 2.50 increase in purchase price. Respondent contends that these additional receipts produce a $ 22,800 commission to Joe or petitioners over and above the $ 114,000 in dispute for 1979. ↩
24. For example, an embezzler's obligation to repay does not render the embezzlement to be in the nature of a loan. This is so because the original act of embezzlement is treated, for Federal income tax purposes, as an accretion of wealth or income. See James v. United States,366 U.S. 213↩ (1961). 25. Respondent utilized $ 45 per acre as petitioner's basis for the sale of land to Sunbird and Cheyenne. Due to our finding that petitioners paid $ 42.50 per acre for the Kitch Ranch property, the basis must also be adjusted to reflect that finding. ↩