JOHN R. AND MARILYN D. WENTZ, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 14223–92.         Filed July 5, 1995.

*David R. Brennan* and *Susan B. Grupe,* for petitioners.
*Blaine C. Holiday* and *Genelle F. Forsberg,* for respondent.

GERBER, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes, additions to tax, and an accuracy-related penalty as follows:

1

| | | Additions to tax | | Penalty |
| | | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(a)(1) | 6653(a)(2) | 6662(a) |
| 1984 | [1] | $204 | [2] | - - - |
| 1988 | $6,243 | 312 | - - - | - - - |
| 1989 | 9,476 | - - - | - - - | $702 |

[1] Petitioners' 1984 net operating loss carryback deduction was reduced, and there was no income tax deficiency determined for 1984. See *C.V.L. Corp. v. Commissioner*, 17 T.C. 812, 816 (1951); *Olsen v. Commissioner*, T.C. Memo. 1993–432.

[2] 50 percent of the interest due on $4,083.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

After concessions, the issues remaining for our consideration are: (1) Whether a plea agreement and a consent order are admissible under rule 408 of the Federal Rules of Evidence (hereinafter rule 408); (2) whether petitioners realized and must recognize income on the purchase of life insurance followed by the immediate return of their premium, and, if so, in what amount; and (3) whether petitioners are liable for the additions to tax and penalty for negligence or intentional disregard of rules or regulations for 1984, 1988, and 1989, or, alternatively for 1989, whether petitioners are liable for the penalty for substantial understatement of income tax.

Petitioners claim a refund of $1,663, representing the value of two 1-year term policies that they included in their 1989 tax return.[1]

### FINDINGS OF FACT[2]

Petitioners, John R. and Marilyn D. Wentz, who were husband and wife at all pertinent times, resided in Fargo, North Dakota, at the time the petition in this case was filed. The Wentzes filed a joint income tax return for each relevant tax year.

Petitioner John R. Wentz was an insurance agent, licensed in North Dakota and Minnesota during the years at issue.

[1] This Court has jurisdiction to determine the amount of a potential overpayment to which this petition relates: Sec. 6512(b)(1).

[2] The parties' stipulated facts and exhibits are incorporated by this reference.

He has been an insurance agent for over 40 years. During the relevant years, Mr. Wentz was licensed to sell insurance products of at least eight different insurance companies.

Thomas Day, a longtime friend of the Wentzes, introduced them to a scheme that would provide them with life insurance for 1 year without cost. The Wentzes agreed that they would apply for whole life insurance. Then, upon approval and payment of the premium, Mr. Day would remit the full premium back to the Wentzes. According to his agreement with the insurance companies, Mr. Day received commissions exceeding 100 percent of the first year premium on the policies sold. Mr. Day kept the difference between his commission (i.e., 115 percent of the premium) and the kickback to petitioners (the premium petitioners paid to the insurance company).

Mr. Day was an employee of two insurance agencies: Midwest Benefits, Inc. (Midwest), and MBI Financial Planners, Inc. (MBIF), each owned by Vernon Haakenson. Messrs. Day and Haakenson were both licensed insurance agents during the years at issue.[3] Mr. Haakenson signed the applications as the agent or witness, although he had not met with petitioners regarding their policies.

On December 8, 1986, Mr. Wentz agreed with Mr. Day that he would apply for $500,000 of whole life insurance coverage from North American Life Insurance Co. (North American). On January 5, 1987, North American issued a valid $500,000 whole life policy to Mr. Wentz, and he obtained a policy loan effective on that date. On January 9, 1987, the loan was applied to the amount owed on the first annual premium, and Midwest issued North American a check for $9,724, on petitioner's behalf, as the balance due. This policy loan reduced the yearend cash surrender value to zero.

On October 26, 1988, Mr. Wentz applied for $500,000 of whole life insurance coverage from Beneficial Standard Life Insurance Co. (Beneficial). On November 21, 1988, Beneficial issued a valid $500,000 whole life insurance policy to Mr. Wentz, who then tendered to Mr. Day a check for $21,595 on

---

[3] N.D. Cent. Code sec. 26.1–04–06 (1985) provides that insured persons and applicants for insurance are prohibited from accepting any rebate of their premium, any part of their solicitor's commission, or any other inducement that is not otherwise specified in the policy. Under this section, the Department of Insurance for the State of North Dakota instituted proceedings against Mr. Haakenson. Both he and Mr. Day have since had their insurance licenses revoked and have received civil fines.

November 28, 1988, covering the first year's premium. That check was turned over to Beneficial. Mr. Wentz then received a $21,595 check dated November 29, 1988, from Midwest.

On August 29, 1989, Mr. Wentz applied for $250,000 of whole life insurance coverage from ITT Life Insurance Corp. (ITT). On November 8, 1989, ITT issued a valid $250,000 whole life insurance policy to him. Mr. Wentz gave Mr. Day a check for $10,975 on November 14, 1989, and he received, in return, a check from MBIF, dated November 14, 1989, in the same amount.

On November 8, 1989, Mr. Wentz applied for $200,000 of whole life insurance coverage from ITT. Subsequently, on December 11, 1989, ITT issued a valid $200,000 policy—this time to Vibrosaun International, Inc. (Vibrosaun). Vibrosaun, a publicly traded company, had 9,080,000 shares of outstanding stock; the Wentzes owned approximately 360,000 shares. Mr. Wentz was a member of Vibrosaun's board of directors; however, he was not an officer. Vibrosaun was engaged in the exploitation of patent and marketing rights with respect to a dry heat sauna system. Mr. Wentz issued a check to Mr. Day, dated December 20, 1989, for $9,176.17 covering the first year's premium. MBIF then issued a check to Mr. Wentz, dated December 21, 1989, for $9,176.17.

Finally, on November 14, 1989, Mrs. Wentz applied for $250,000 of whole life insurance coverage from ITT. ITT issued a valid $250,000 policy to her on December 11, 1989. Mr. Wentz then gave Mr. Day a check, dated December 20, 1989, for $4,574.16 to cover the first year's premium for his wife's policy. MBIF then issued a $4,574.16 check to Mr. Wentz, dated December 20, 1989.

In each instance, the Wentzes did not renew their respective life insurance policies. Instead, they allowed the policies to lapse by simply not making the second year's premium payments. Petitioners also did not intend to renew any of the policies involved in the scheme with Mr. Day.

Believing that the insurance transaction would be taxable based on information from the district director in Fargo, North Dakota, petitioners included, as income in their 1989 tax return, the value of 1 year of term life insurance: $1,185 for Mr. Wentz's $250,000 of coverage in 1989, and $478 for Mrs. Wentz's $250,000 of coverage in 1989. The amount petitioners reported as income was less than the annual pre-

mium paid for those policies. The Wentzes had their tax returns prepared by Widmer Roel & Co., in 1987, 1988, and 1989.

Mr. Haakenson's insurance license was revoked effective October 1, 1990. Moreover, on May 13, 1992, he pled guilty to violating 18 U.S.C. sections 1341 (for, inter alia, obtaining money through false pretenses) and 1343 (for transmitting the fraudulent insurance scheme via interstate communication) (1988), and section 7206(1) (for willfully subscribing to a false tax return).

OPINION

*Admissibility of the Plea Agreement and Consent Order*

Respondent offered two exhibits to which petitioners objected and concerning which we reserved our ruling. They are a plea agreement between the State of North Dakota and Mr. Haakenson (Exhibit AA) and a consent order between the North Dakota Commissioner of Insurance and Mr. Haakenson (Exhibit AC). We found these exhibits to be relevant and material; however, we reserved our ruling on petitioners' objection to the admissibility of the documents under rule 408.

Rule 408 provides, in relevant part, that

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. * * *

The obvious purpose of rule 408 is to promote settlements. Inadmissibility is limited to evidence of settlement negotiations and documents concerning the compromise of a claim. In addition, the restriction against admitting such evidence applies only when it is being offered to show liability or that some underlying claim is invalid. Rule 408.

The Wentzes argue that, under rule 408, the plea agreement and consent order are inadmissible offers to compromise. Respondent counters that they are not being offered to prove liability under or the validity of a claim, and, therefore, rule 408 does not exclude them from evidence.

Exhibit AA is the plea agreement between the State of North Dakota and Mr. Haakenson. In that agreement, pursuant to rule 11(e)(1)(B) of the Federal Rules of Criminal Procedure, Mr. Haakenson acknowledged that he was charged with violating 18 U.S.C. sections 1341 and 1343 (1988), and section 7206(1); that he understood the elements of the crimes; and that he voluntarily agreed to plead guilty to three counts of the indictment against him. Mr. Haakenson also agreed that the plea agreement would become a part of the court or public record, and that he was, in fact, guilty. In addition, the plea agreement described the details of the life insurance schemes which are the subject of this case.

Exhibit AC is the consent order between the North Dakota Commissioner of Insurance and Mr. Haakenson, which, like the plea agreement, contained descriptions of the life insurance schemes. In the consent order, Mr. Haakenson, among other matters, consented to the revocation of his insurance license and to the payment of a $10,000 civil penalty. Respondent offered these documents to show the relationship between Mr. Haakenson and the insurance companies.

Rule 143(a) provides that trials before this Court are to be "conducted in accordance with the rules of evidence applicable in trials without a jury in the United States District Court for the District of Columbia." See sec. 7453.

Settlement agreements are admissible if offered for a purpose other than to show liability or the validity of a claim. *Tijerina v. Josefiak,* 50 Empl. Prac. Dec. (CCH) par. 38,943 (D.D.C. 1988) (citing *County of Hennepin v. AFG Indus., Inc.,* 726 F.2d 149, 153 (8th Cir. 1984)); see also *Sage Realty Corp. v. Insurance Co. of N. Am.,* 34 F.3d 124 (2d Cir. 1994); *Johnson v. Hugo's Skateway,* 974 F.2d 1408 (4th Cir. 1992).

Petitioners argue on brief that rule 408 "applies with respect to completed compromises", emphasizing that rule 408 can apply to multiple documents. We agree with respondent, however, that the plea agreement and consent order were not being offered with respect to any claim against Mr. Haakenson, nor were the exhibits offered to show the validity of the underlying claims. Consequently, we find that rule 408 does not preclude the admission of the exhibits. They were offered only to show Mr. Haakenson's relationship to the insurance companies. Petitioners' motion

to exclude Exhibits AA and AC from evidence will, accordingly, be denied.

*The Premium Kickbacks*

Respondent determined that petitioners realized taxable income, measured by the value of the life insurance coverage received. Respondent also determined that the value of the insurance, in each year, was equal to the premium paid to the insurance company, which, in turn, was kicked back by the agent, Mr. Day.

Conversely, petitioners argue that the kickback was merely a nontaxable rebate, and that the purchase price, or lack thereof, was bargained for. Alternatively, petitioners contend that, if the receipt of the insurance policy is taxable, it should be valued as a 1-year term policy. Petitioners claim that this is more appropriate because they never intended to renew or otherwise treat the policies as whole life policies, and, thus, they served only as term insurance. Petitioners bear the burden of showing that they were not required to recognize taxable income in the amount of their kickbacks. Rule 142(a); *Welch v. Helvering,* 290 U.S. 111 (1933).

Section 61(a) defines gross income as "income from whatever source derived". We must decide whether the kickbacks are gross income. Petitioners view the kickbacks as mere reductions in their purchase prices and not as realized income. They refer to a line of cases holding that the net purchase price is used in computing a seller's gross sales income, and that their purchase should be treated similarly. See, e.g., *Max Sobel Wholesale Liquors v. Commissioner,* 630 F.2d 670 (9th Cir. 1980), affg. 69 T.C. 477 (1977) (free liquor given to customers in violation of State law was properly included in cost of goods sold); *Dixie Dairies Corp. v. Commissioner,* 74 T.C. 476 (1980) (cash rebates paid to customers by milk dealers were excludable from dealers' gross income); *Pittsburgh Milk Co. v. Commissioner,* 26 T.C. 707 (1956) (milk sold for below legal minimums taxed at what the consumer actually paid, not at the fictitious legal price). Specifically, petitioners contend that the polices were simply "purchased" (acquired), albeit at no cost.

Respondent distinguishes these circumstances, contending that, because the true sellers (the insurance companies) did

not authorize the kickbacks, there is no valid rebate. If the insurance companies did not authorize the rebates, then they are neither valid nor part of any bargained-for price between petitioners and the insurance companies.

The U.S. Court of Appeals for the Eighth Circuit, to which an appeal would lie in this case, recently affirmed a District Court opinion with substantially similar facts. *Woodbury v. United States,* 74 AFTR 2d 94–5188, 93–2 USTC par. 50,528 (D.N.D. 1993), affd. per curiam without published opinion 27 F.3d 572 (8th Cir. 1994).[4] In *Woodbury,* the taxpayers purchased whole life policies from Messrs. Day and Haakenson. The Woodburys were told that if they agreed to apply for and pay the premiums for 1 year of whole life insurance, then the agent would kick back so much of his commission as equaled the premiums paid. The insurance agent received a 115-percent commission on the first year's premiums; hence, the agent would pocket the difference between the 115-percent commission and the 100-percent kickback. After 1 year, the taxpayers were not required to renew the policy. The policies were allowed to lapse after the first year.

The District Court held that the policies were of the whole life variety, and that their fair market value was equal to the amount kicked back by the insurance agent (i.e., the premiums paid). The focus was on the taxpayers' entitlement to insurance benefits for the entire year for which the policy was in effect. During that time, the Woodburys could have accumulated a cash surrender value, and they possessed the option of renewing the whole policy. The District Court rejected the taxpayers' argument that the effect of the transaction was no more than the benefit under a term life insurance agreement. The court next addressed the question of whether the kickback was includable in the taxpayers' income. The taxpayers argued that the rebate was a bargained-for part of their purchase, even if for the entire price. The court referred to *Alex v. Commissioner,* 628 F.2d 1222 (9th Cir. 1980), affg. 70 T.C. 322 (1978). That case involved the insurance agent's side of the transaction, and whether the rebated portion of the commission received from the insurance company could be subtracted from gross income, or whether it was deductible as a business expense. If it was an

---

[4] See *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

adjustment to gross income, then it would have been allowable. However, if it was a business expense, then section 162(c) barred the deduction. In *Alex,* it was held that the agent had no authority to adjust the price of the policy, because the insurance company was the seller, not the agent. The court in *Woodbury* did recognize that the premiums would be taxed twice (i.e., as unadjusted commissions by the insurance agent and as a kickback by the taxpayer). However, the court stressed that "any inequity should run in favor of the government and against participants of an illegal scheme." *Woodbury v. United States, supra.*

Petitioners here participated in the same type of transaction as the Woodburys, and with the same agents. The two cases differ, however, in that petitioner John Wentz, unlike the Woodburys, was a licensed insurance agent at the time of the transactions. This factual difference must be considered. In addition, the parties here have advanced several theories which were not addressed in *Woodbury*.

Income includes commissions received as compensation for services. Sec. 61(a)(1). At all pertinent times, Mr. Wentz was a licensed insurance sales agent. As one alternative, respondent contends that Mr. Wentz, in effect, sold the insurance policies to himself, and should thus include the kickbacks as commission income.

In *Commissioner v. Minzer,* 279 F.2d 338 (5th Cir. 1960), revg. 31 T.C. 1130 (1959), the taxpayer was a licensed insurance broker. Besides selling policies to third persons, Mr. Minzer would acquire policies on his own life. As part of Mr. Minzer's arrangement with certain insurance companies, he was entitled to commissions on the policies on his own life. The U.S. Court of Appeals for the Fifth Circuit, reversing a reviewed and divided opinion of this Court, held that the commissions were taxable to the agent as if he had sold policies to third parties. The Court of Appeals held that it made no difference whether the taxpayer received the commissions separately or through a lowered purchase price.

Mr. Minzer received his payments or price reductions directly from the insurance companies. Mr. Wentz, however, received his payments as kickbacks from the agents, Messrs. Day and Haakenson. This fact distinguishes the instant case from *Minzer*. Hence, unlike Mr. Minzer, Mr. Wentz did not receive insurance commissions.

On brief, respondent argues that the "exact issue" in the instant case has already been decided in *Woodbury v. United States, supra*. In the alternative, respondent attempts to factually distinguish the instant case from *Woodbury* by arguing that Mr. Wentz was a licensed insurance agent and that he earned commissions. We disagree with respondent's argument that Mr. Wentz earned commissions from the insurance companies. His status as a licensed insurance agent was of no effect in this controversy. Accordingly, the kickbacks were not commissions.

As in *Alex v. Commissioner, supra*, Messrs. Day and Haakenson had no authority from the insurance companies to rebate any part of petitioners' premiums. The insurance companies were the sellers, and petitioners were the buyers. As between these two parties, there was no discount, rebate, or incentive payment offered or bargained for. The insurance companies did not approve of the agents' scheme.[5]

Petitioners argue that the premium kickbacks are analogous to the practice of using coupons to induce the purchase of goods. Manufacturers and retailers provide coupons as an incentive for customers to purchase products. When a coupon is provided, a price reduction is being offered to induce sale of the product. On occasion, a retailer or manufacturer may invite customers to receive or use a product for a trial period without charge or obligation.[6]

We recognize that certain transactions do provide bona fide discounts.[7] Messrs. Day and Haakenson, however, were not offering a discount on their insurance policies. Instead, as agents, they solicited and received applications on behalf of various insurance companies. Messrs. Day and Haakenson were not shown to have had the authority to negotiate rebates or price reductions. They entered into the kickback scheme without the consent of the true sellers (i.e., the insurance companies). Consequently, when the agents returned part of their commission to petitioners, there was no rebate (coupon or discount) or negotiated premium reduction. This

---

[5] As a practical matter it is difficult to envision the insurance companies' acquiescence to this scheme where the net result is to pay out amounts exceeding premiums by 15 percent, and exposure to possible policy claims for 1 year, with little or no likelihood of renewals.

[6] See also Rev. Rul. 76–96, 1976–1 C.B. 23 (Internal Revenue Service agrees that, where an automobile manufacturer offers a rebate to the general public, the customer who purchases an automobile from the manufacturer does not recognize income on receipt of the rebate).

[7] *Id.*

was merely a device by which Mr. Day was able to generate commission income.[8] Accordingly, we reject petitioners' rebate position.

In addition to the parties' arguments, other possible theories exist to assist in analyzing this case. We note that the parties have addressed these insurance transactions as a single blended series of events. However, they overlook the distinct, severable events that make up the whole. The Wentzes had an agreement with Mr. Day under which the Wentzes would apply for and pay premiums to obtain life insurance. In exchange, Mr. Day would pay the Wentzes a sum equal to the required premium. As between the Wentzes and the various insurance companies, the policies provided that the Wentzes would pay a premium, and the insurance companies would provide life insurance coverage. Finally, Mr. Day and the insurance companies agreed that, upon Mr. Day's successful sale of a policy, the insurance companies would pay him a commission, which in these instances exceeded the premiums.

The parties, in effect, view these three agreements as a single transaction. Specifically, the Wentzes argue that, when collapsed, this transaction was merely a bargained-for exchange where they happened to receive insurance at no cost. Respondent similarly views this as insurance at no cost; however, she stresses that, because no rebate was authorized by the insurance companies, and because of petitioners' apparent accessions to wealth, the insurance benefits resulted in taxable income.

We cannot ignore the discrete agreements underlying this scheme. Messrs. Day and Haakenson compensated the Wentzes in return for their applying for and purchasing 1 year of whole life insurance. We cannot view these agreements as parts of a mere bargained-for price reduction. While use of the step transaction doctrine may be appropriate to reflect the realities of certain transactions, it would have the opposite effect here. *Glacier State Elec. Supply Co. v. Commissioner,* 80 T.C. 1047, 1057–1058 (1983). Petitioners

---

[8] In terms of the Federal tax effect on Mr. Day's scheme, it could result in a negative cash-flow if his marginal tax rate exceeded the percentage commission that the insurance companies paid in excess of the premium. Because Mr. Day generally received 115 percent, absent a gross income adjustment or deduction for the amounts paid to the insured, it is likely that the scheme did not work.

were compensated with the annual benefits of whole life insurance policies, thus triggering a taxable event.

In *Commissioner v. Duberstein,* 363 U.S. 278 (1960), Mr. Duberstein and an acquaintance were engaged in separate metal businesses in separate States. Periodically, Mr. Duberstein would inform his colleague of a potential customer. Because the information had proven to be quite useful to the acquaintance, and to show his appreciation, the colleague sent Mr. Duberstein a Cadillac. Mr. Duberstein later argued to this Court that the automobile was a gift, and that it was given to him because of the close relationship with his colleague. This Court disagreed. See *Duberstein v. Commissioner,* T.C. Memo. 1958–4, revd. 265 F.2d 28 (6th Cir. 1959), revd. 363 U.S. 278 (1960). The Supreme Court affirmed this Court, and found that the transfer of the Cadillac, at the very least, was "a recompense for Duberstein's past services, or an inducement for him to be of further service in the future." *Commissioner v. Duberstein,* 363 U.S. at 291–292.

Petitioners, likewise, did not receive a gift. Instead, they were compensated by Mr. Day for their services in applying for and purchasing life insurance policies. Between Mr. Day and the Wentzes, there was no detached and disinterested motive. Mr. Day and the Wentzes had an agreement, albeit illegal, which removes any element of gift giving. This agreement was based on consideration.

In *Woodbury v. United States,* 74 AFTR 2d 94–5188, 93–2 USTC par. 50,528 (D.N.D. 1993), the court held that both the agents and the insured(s) may be subject to tax on the commissions. *Alex v. Commissioner,* 70 T.C. 322 (1978), strongly suggested that Messrs. Day and Haakenson would have taxable income on their receipt of the commissions, and that their kickback payments are not deductible. See sec. 162(c)(2). The District Court in *Woodbury* went further, holding that any inequity resulting from double taxation should fall upon the shoulders of those engaged in the illegal scheme. *Woodbury v. United States, supra.*

Petitioners received kickbacks that they were not required to return to the agents. There were no conditions or restrictions on the receipt of their payments. The fact that others may be required to recognize income on the same receipts, with no offsetting deduction, is a direct consequence of section 162(c)(2) (precluding the deduction of illegal payments).

The Supreme Court addressed this concept, more than 60 years ago, as follows:

If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. * * * [*North Am. Oil Consol. v. Burnet,* 286 U.S. 417, 424 (1932).]

Gross income is "all inclusive". *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 432 (1955). The insurance premium kickbacks provided petitioners with "undeniable accessions to wealth, clearly realized, and over which * * * [they had] complete dominion." *Id.* at 431.

There is little doubt that illegally earned income is taxable. See *James v. United States,* 366 U.S. 213 (1961). Petitioners realized income by receiving kickbacks from then insurance agents Messrs. Day and Haakenson. As there is no applicable statutory exclusion, this income must be recognized.

*Measurement of Income*

We must now decide the amount of income petitioners must recognize. They argue that their benefit, if any, was more akin to term, rather than whole, life insurance. Term life insurance is coverage that is normally issued for 1 year, although greater periods can be covered. Term life policies provide only a death benefit; there is no accumulation of cash value. Whole life policies, conversely, contain a death benefit plus the accumulation of cash surrender value which Mr. Wentz took advantage of. Premiums are typically paid for one's whole life, not for defined periods. The cost and, hence, value of term life insurance coverage would be less than that of whole life insurance.

Petitioners assert that, when they agreed to purchase their policies, they intended not to renew after the first year, thereby causing their policy to be more like term life insurance. Petitioners believe that we should recognize their intentions and, in effect, ignore the realities. The Wentzes, however, received whole life protection, along with the potential to accumulate cash surrender value. Whether or not petitioners intended to renew their insurance policies after 1 year is of no consequence—they purchased whole, not term,

life insurance. Petitioners had the option of renewing their policies if, for example, petitioners became ill during the first year of the policies in question. Substantively, petitioners were entitled to full benefits of the whole life policies.

*Woodbury v. United States, supra,* held that the taxpayers had realized income to the extent that they were remitted their premiums by Messrs. Day and Haakenson. We agree with the holding in *Woodbury,* and find that the Wentzes realized income in the amounts of the kickbacks. This is the extent to which petitioners had "accessions to wealth". *Commissioner v. Glenshaw Glass Co., supra.*

Furthermore, as detailed above, we find that petitioners were compensated for their services. Specifically, they were paid an amount equal to the premiums in exchange for their applying for and purchasing whole life insurance. That is the proper measure of their income.

*Negligence*

Respondent determined that petitioners were liable for additions to tax for negligence or intentional disregard of rules or regulations under section 6653(a)(1) for 1984 and 1988 and for the penalty for negligence under section 6662(a) for 1989. If petitioners are liable under section 6653(a)(1) for 1984, then they are liable for 50 percent of the interest due on $4,083 under section 6653(a)(2).

Respondent argues that, by omitting the kickback from their income, petitioners were negligent. Petitioners contend that their litigation position is reasonable, and, because there were plausible theories and case law supporting their return position, they acted reasonably and diligently. We must decide whether the Wentzes were negligent with respect to their choice not to report the full amounts returned by Mr. Day in their income.

"'Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" *Neely v. Commissioner,* 85 T.C. 934, 947 (1985) (quoting *Marcello v. Commissioner,* 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964)). The arrangement between the Wentzes and Messrs. Day and Haakenson effectively provided the Wentzes with the benefit of whole life insurance coverage without

cost. After Mr. Wentz paid the required premium, he immediately received the same amount back from the agents, not the insurance companies. Although Mr. Wentz is a licensed insurance agent and he may have known that the arrangements with Mr. Day were not proper under local insurance regulatory provisions, that fact does not govern whether the receipt of the insurance benefits was taxable. At the time petitioners filed their Federal tax returns, no court had considered or decided the exact question addressed in this opinion. We note that the Wentzes had their tax returns prepared by tax advisers. Furthermore, after the Fargo, North Dakota, office of the Internal Revenue Service advised petitioners that their transaction would be taxable, they did promptly include some amount of the premium as income in 1989.

Although we reject petitioners' legal position, it is not frivolous. Petitioners simply were misdirected and misguided under the circumstances. Petitioners, respondent, and this Court have viewed the question of whether income was realized from several different possible perspectives, including theories involving rebates, kickbacks, compensation, and gifts. Petitioners treated the benefit as a rebate rather than as a kickback or consideration in exchange for their performance, which was reasonable under the circumstances. Hence, we find that the Wentzes were not negligent for failing to report the insurance benefits as income.

*Substantial Understatement of Income Tax*

On brief, respondent, for the first time, argued that petitioners are liable for the accuracy-related penalty under section 6662 for substantially understating their income tax, should we find that they were not negligent. Because we have not found negligence, we must consider whether there was a substantial understatement of income tax.

In the notice of deficiency, respondent determined that, for 1989, petitioners were liable for the penalty under section 6662(b)(1) (for negligence or disregard of rules or regulations). Until the time for briefing, respondent made no mention of section 6662(b)(2) (substantial understatement of income tax) in the notice of deficiency, in her answer, or in any other form. On brief, however, respondent argued for the

first time that, if petitioners were not negligent for 1989, they were liable for the penalty for substantially understating their income tax. We will not consider issues raised first on brief and not raised in the pleadings. *Rollert Residuary Trust v. Commissioner,* 80 T.C. 619, 636 (1983), affd. on other grounds 752 F.2d. 1128 (6th Cir. 1985); *Estate of Kleemeier v. Commissioner,* 58 T.C. 241, 250 (1972). Petitioners were not afforded the opportunity to address that issue; therefore, they did not attempt to show that section 6662(b)(2) should not be applied. Accordingly, petitioners are not liable for the penalty for substantially understating their income tax for 1989.

> *An appropriate order will be issued denying petitioners' motion to exclude exhibits, and decision will be entered for respondent except for the additions to tax under section 6653 for 1984 and 1988, and the penalty under section 6662(a) for 1989.*