T.C. Memo. 1997-525


UNITED STATES TAX COURT


VERL W. AND FRANCES M. HADERLIE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8856-96.                    Filed November 19, 1997.


Verl W. and Frances M. Haderlie, pro sese.

<u>Michael W. Lloyd</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined a $10,049 deficiency
in petitioners' 1991 income tax that is attributable to one
adjustment.[1]  That adjustment pertains to a scheme where

---

[1] An automatic computational adjustment was also made to
petitioners' claimed Schedule A medical deduction due solely to
the increase in adjusted gross income and a corresponding
increase in the threshold for the medical deduction.

petitioner Verl W. Haderlie applied for an insurance policy, paid the $40,653 premium, and $40,653 was returned to him by the procuring insurance agent. The insurance agent promoted the transaction because he received about 118 percent of $40,653 from the insurance company as an inducement to sell its policies. Respondent determined that the above-described circumstances resulted in income to petitioners measured by the cost of the insurance coverage or the $40,653 premium.

We first addressed this type of scheme or transaction in Wentz v. Commissioner, 105 T.C. 1 (1995), and held that the taxpayer/insured realized income in the amount of the insurance premium kickbacks from the insurance agent. Petitioners here argue that the circumstances of their case vary from Wentz v. Commissioner, supra, in a manner that would change the outcome.

FINDINGS OF FACT

Petitioners had their legal residence in Idaho Falls, Idaho, at the time their petition was filed. Verl W. Haderlie (petitioner) is a high school graduate and has been involved in the business of hauling milk by truck. During 1991, petitioner was involved in the technical aspects of the process of producing milk, including the identification and cure of bacterial problems. From this activity and a small farming operation, petitioner earned somewhat less than $50,000 for the 1991 taxable year.

Through a colleague, petitioner learned about Daniel Schwab (Schwab), an insurance agent who was offering $1,250,000 of life insurance for a "minimum premium". After advising the colleague of his interest, petitioner received a telephone call from Schwab. Schwab confirmed that he was offering $1,250,000 of life insurance for a "minimum premium" and that petitioner would need a physical exam, paid for by Schwab, and after 1 year, petitioner could either extend or cancel the policy. At the time of the conversation with Schwab, petitioner already owned a whole life insurance policy with coverage in the range of $100,000 to $150,000. At the same time, petitioner believed that his need for life insurance coverage was in the $300,000 to $500,000 range.

Thereafter, petitioner met with Schwab, who promoted a $1,250,000 policy with Royal Maccabees Life Insurance Co. (Royal), and petitioner agreed to apply for a policy. Schwab then accompanied petitioner to a medical center where a physical exam was administered to petitioner. Petitioner, during 1991, remitted separate checks in the amounts of $3,500 and $40,653 made payable to Stable Reserve, Inc. (Stable Reserve), and Royal, respectively. Stable Reserve was Schwab's straw entity used as a conduit for the insurance scheme. At the same time, Schwab remitted a $40,653 check to petitioner. In 1992, Schwab remitted a $3,500 check to petitioner. Schwab's $40,653 check to

petitioner was drawn on an account in the name of "Stable Reserve, Inc."  Petitioner instructed Schwab to delay the deposit of petitioner's $40,653 premium check to Royal for a few days in order to permit petitioner's deposit of the $40,653 Stable Reserve check from Schwab to fund petitioner's check.

In addition to remitting the two checks, petitioner signed a document that contained the recitation that the $40,653 check payment to him from Stable Reserve (Schwab) was a nonrecourse loan.  Petitioner and Schwab understood that the signed document reciting the existence of a nonrecourse loan was prepared and executed in the event that the Internal Revenue Service looked into their insurance transaction and that the document had no substance or effect.  Beginning in 1991, petitioner and his beneficiary(ies) had the benefit of $1,250,000 in life insurance coverage from Royal.  The coverage was under a universal life policy, which differs from a whole life policy in that a universal life policy more closely reflects current interest rates thereby improving the accumulation of cash value.  The $40,653 premium paid by petitioner was competitive with the premium charged by insurance companies other than Royal.  Schwab, in turn, was entitled to a commission approximating 118 percent of the $40,653 1-year's premium on petitioner's Royal life insurance policy.

The Royal insurance arrangement was transacted in Idaho Falls, Idaho. Schwab was licensed to conduct insurance business in Wyoming, but not in Idaho. Royal was licensed to do business in Idaho. Rebating by an insurance agent violates Idaho insurance law. An insurance company is permitted to rebate part or all of an insurance premium under the law of Idaho. So long as petitioner made no misrepresentation in applying for the insurance with Royal, the rebating aspect, although in violation of Idaho law insofar as the rebate was made by Schwab, would not invalidate the insurance coverage between Royal and petitioner. Royal was aware of the rebating after petitioner's policy had been applied for and came into force, and, because of its view that petitioner had done nothing illegal, Royal did not attempt to cancel the policy or contact petitioner. Royal believed that only Schwab was involved in illegal activity (rebating). The rebating by Schwab also violated the terms of the agreement and/or relationship between Schwab and Royal.

Petitioner was under the mistaken impression that after the first year of the Royal policy, he would have been entitled to reduced coverage for the next year at a $3,500 premium. Although petitioner thought the Royal insurance transaction was unusual, he was not aware of any illegality or irregularity until after the policy had been allowed to lapse. Petitioner's Royal policy was allowed to lapse at the end of the first year, and just prior

to that time Schwab approached petitioner with another insurance transaction with Columbus Life Insurance Co. (Columbus).

The Columbus transaction was for life insurance coverage beginning during 1993 and was, in most respects, substantially similar to the Royal transaction. The Columbus transaction differed from the Royal transaction as to the amount of coverage ($1,000,000 as opposed to $1,250,000), the absence of a document indicating a nonrecourse loan, and in the Columbus transaction petitioner refused to execute a premium check to Columbus. In the Columbus transaction, Schwab paid petitioner's premium directly to Columbus.

Petitioners did not report any income in connection with the Royal/Schwab insurance arrangement on their 1991 Federal income tax return. Respondent determined that the $40,653 premium (for 1 year) on the Royal life insurance policy was income to petitioners for 1991.

OPINION

Transactions substantially similar to the one in this case were considered in Wentz v. Commissioner, 105 T.C. 1 (1995), and Woodbury v. United States, 72 AFTR 2d 93-6140, 93-2 USTC par. 50,528 (D.N.D. 1993), affd. per curiam without published opinion 27 F.3d 572 (8th Cir. 1994). In those cases, taxpayers who had received the benefit of life insurance coverage in situations where the agent kicked back the premium were found to have income

taxable in the year of the transaction in the amount of the premium that had been paid and kicked back.

Respondent relies on those cases, arguing that the record in this case contains no distinction(s) to cause a result different from the prior cases. Petitioners, who are pro se, argue that they should not have to recognize income because of the following theories: (1) The "market value was nothing because * * * [Royal] was not legal in Idaho and neither was * * * [Schwab]". (2) Royal was aware of Schwab's illegal rebating scheme and did nothing because it would have had to pay back the premiums to the insured, and it was easier for Royal to "let it ride out than pay back all of the premiums." We agree with respondent.

Petitioners' arguments are based on illegality as the reason why they should not be required to recognize income from the insurance transaction. Initially, we note that Royal (insurance company) was licensed in Idaho, and Schwab (agent) was not licensed in Idaho. Petitioners contend that due to either the illegality of rebating and/or the fact that Schwab was not licensed to sell insurance in Idaho, the insurance coverage had no value. We surmise that petitioners are arguing that the illegality would have provided Royal with a defense to paying benefits on the policy in the event that petitioner died while the policy was in force. State law and evidence in the record do not present a defense that Royal could have interposed to a claim

by petitioner's beneficiary. A representative of the Idaho Department of Insurance and a representative of Royal testified that, short of misrepresentation or wrongdoing by petitioner, there was no reason why Royal could avoid payment of a claim. Additionally, the rebating by the agent, although illegal under State law, did not provide the insurance company with a defense to a claim on the policy. There is no evidence of wrongdoing or any misrepresentation by petitioner. If there had been some wrongdoing and/or misrepresentation by petitioner regarding the policy, Royal may have had a defense to payment on the policy. The only wrongdoing was a rebating of the premium to petitioner by Schwab.

Under Idaho's insurance statutes, unauthorized rebating by an insurance agent is illegal. See Idaho Code sec. 41-1314 (1991). In this case, rebating also violated the terms of the agreement and contractual relationship between the insurer and the agent, but has no direct effect on the insured. Royal might have had recourse to recover the rebated portion of the premium (in this case the entire first year premium) from Schwab, but that does not change the fact that petitioner had the benefit of 1 year's universal life insurance coverage, along with an option to renew. As discussed in Wentz v. Commissioner, supra, even if petitioner had become uninsurable during the year, he could have

continued the Royal policy by payment of the premium for each successive year.

Petitioners also discuss the fact that they were financially unable to afford the $40,653 annual premium and that they had to wait until Schwab's rebate check was credited to petitioner's bank account before their equal-in-amount premium check to Royal could be honored. In that regard, petitioners argue that their maximum insurance coverage needs were no more than a few hundred thousand, if they could afford it. It is irrelevant that the insurance transaction entered into by petitioner was beyond his needs or means. Our focus must be on the benefit or enrichment petitioners received. Although the transaction with Royal, through Schwab, may have been "too good to be true," petitioners were willing to engage in the transaction because they received a benefit. They did not become involved with Schwab out of disinterested generosity. Instead, they willingly applied for a $1,250,000 policy with Royal knowing that they would receive the benefit of that coverage for a year without any cost. In order to obtain that benefit, petitioner signed various documents, took a physical, and made representations that he was applying for and accepting $1,250,000 of coverage. In exchange for that performance, petitioner received $40,653 from Schwab and/or the benefit of $40,653 of insurance without payment. Either way, petitioners were enriched.

It is somewhat ironic that if Royal had offered and/or authorized its agent (Schwab) to offer petitioner 1 year of insurance coverage at no cost as an inducement to continue the coverage in the future, the tax consequences might have been different. In that type of circumstance, courts have held that the "reduced" price or rebate is not taxable to the consumer. See, e.g., Pittsburgh Milk Co. v. Commissioner, 26 T.C. 707 (1956). Here, however, the insurance company was not offering a price reduction or rebate. Instead, the agent, without the insurer's approval or agreement, devised an illegal scheme to take advantage of his contractual relationship with the insurer. The agreement between the insurer and the agent was for the agent to receive about 118 percent of the first year's premium as a commission for selling the policy. In turn, the agent paid petitioner the amount of the premium, in exchange for petitioner's applying for the insurance coverage. As a result, the agent received about 118 percent of 1 year's premium, and petitioner received the benefit of 1 year's insurance coverage. Although petitioner may not have understood the technical distinction between a rebate and a kickback, he was aware that his payment to the insurance company was repaid to him by the agent in exchange for his performance.

We can empathize with petitioners to the extent they relied on Schwab, did not wish to do anything improper, and never

anticipated that their involvement would subject them to a tax burden or possible financial hardship. Their actions, however, are well documented, and the tax burden that results in these circumstances has been considered, analyzed, and explained by this and other courts. Petitioner signed an illusory document reciting that a nonrecourse loan existed in the event that the Internal Revenue Service looked into their insurance transaction. Under these circumstances we do not see petitioner as an unwitting participant. We also note that petitioners became involved with Schwab in a subsequent and similar insurance coverage scheme. In the subsequent transaction, petitioner had become leery, refusing to sign any documents or to remit checks to the insurance company in exchange for a check from Schwab. In the subsequent transaction, Schwab paid the insurance company, and petitioner applied for the insurance and was subjected to a physical exam in order to be entitled to the insurance coverage. In either situation, petitioner had to apply for insurance, take a physical exam, and manifest to the insurer his intent to apply for insurance. In exchange for those actions or consideration, petitioners received the benefit of $1,250,000 of insurance coverage, which was ultimately paid for by the agent, Schwab.

To reflect the foregoing,

Decision will be entered for respondent.